**UNITED STATES of America**

**v.**

**Frank NARDUCCI, a/k/a "Chickie", et al.**

**Crim. No. 71–312.**

United States District Court,
E. D. Pennsylvania.

March 23, 1972.

------&------

Louis C. Bechtle, U. S. Atty., Robert Kelly, Joel Slomsky, Asst. U. S. Attys., Philadelphia, Pa., for plaintiff.

George Gershenfeld, Anthony DeFino, Herbert Ocks, Edward Reif, Alfred Marroletti, Louis Lipschitz, Isadore A. Shrager, Herbert Hardin, Philadelphia, Pa., for defendants.

OPINION AND ORDER

EDWARD R. BECKER, District Judge.

This is a motion to suppress the contents of certain electronically intercepted telephone conversations. The wiretaps were made pursuant to Orders entered by former Chief Judge John W. Lord, Jr. of this Court pursuant to applications by Raymond E. Makowski, a special attorney for the United States Department of Justice, under the provisions of Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2510 et seq. ("Act").[1] The defendants have been indicted for violations of 18 U.S.C. § 371 (conspiracy) and 18 U.S.C. § 1955.[2] According to the Government, the intercepted communications constitute the principal evidence against them.

Title III of the Act establishes a stringent step by step procedure (spread out over some 8½ pages of the U. S. Code) encompassing the entire life cycle of a wiretap. Commencing with the conception of the wiretap in the authorization by the Attorney General, the procedure then provides for its gestation in an application to a competent court requiring meticulous detail and several showings of probable cause, and its birth in the carefully parsed Order of a judge. The Act then goes on to cover such matters as the manner of conducting the interception, the inventorying and impounding of the results of the interception, the notification to the persons whose conver-

---

1. Judge Lord's Order of March 16, 1971 authorized interception for a maximum of fifteen days. On April 6, 1971, Mr. Makowski applied for and received Judge Lord's authorization to continue the interception for an additional fifteen days. Since the extension of a wiretap must be authorized in the same manner as the original, our discussion does not differentiate between them. As it happens in the case, the manner of processing the application for the original wiretap and the extension were identical and accordingly they stand or fall together.

2. *Inter alia*, 18 U.S.C. § 1955 provides that it is an offense to conduct, finance, manage, supervise, direct or own all or part of an illegal gambling business. An illegal gambling business is defined as a gambling business which:

    (1) is a violation of the law of the state or political subdivision in which it is conducted;

    (2) involves five or more persons; and

    (3) has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day.

    The Motions to Suppress have been joined in by all defendants.

sations were intercepted, rules of access to the recordings or tapes, and a host of other "do's" and "don't's" pertaining to wiretaps. Not even the tenure of the tap escaped the congressional pen—thirty days is the absolute maximum length of time allowed for a particular wiretap.

The section of the Act upon which the defendants' motion to suppress is bottomed, 18 U.S.C. § 2516(1), reads as follows:

> "The Attorney General, or any Assistant Attorney General specially designated by the Attorney General, may authorize an application to a Federal judge of competent jurisdiction for, and such judge may grant in conformity with section 2518 of this chapter an order authorizing or approving the interception of wire or oral communications . . ."

The defendants contend that the Government has failed to comply with the requirements of this section because the source of the requisite wiretap authorization was not the then Attorney General John N. Mitchell, but his Executive Assistant, Sol Lindenbaum. It is conceded by the Government (see discussion of facts, *infra*) that Mr. Lindenbaum not only authored the memorandum of approval, but also penned the Attorney General's initials ("JNM") to it. The Lindenbaum memorandum was directed to Will Wilson, the Assistant Attorney General in charge of the Criminal Division of the Department of Justice, who,

under certain circumstances (see *infra*), might have had the authority to authorize a wiretap application. It is also conceded by the Government that Mr. Wilson did not sign the letter; instead, his name was signed on the letter by his Deputy Assistant, Henry E. Petersen. The facts which form the bases of the motion are uncontradicted and are amplified by the filed affidavits of Attorney General Mitchell and Messrs. Lindenbaum, Wilson and Petersen. These facts, however, are not novel; they are virtually identical to the facts in five previous cases decided in federal courts throughout the land.[3] We turn to a discussion of the relevant statutory provisions and legislative history and of these cases.[4]

### I.

In Berger v. New York, 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1947), the Supreme Court described electronic eavesdropping, as by its very nature, "an intrusion of privacy that is broad in scope," and observed that "[few] threats to liberty exist which are greater than that posed by the use of eavesdropping devices." Id. at 56, 63, 87 S.Ct. at 1885. A reading of Title III and its legislative history leaves no doubt that Congress intended to prohibit all wiretapping and electronic surveillance except by law enforcement officials investigating certain enumerated crimes and under a carefully circumscribed and strictly controlled procedure.[5] The legislative

---

3. The leading case is United States v. Robinson et al., Crim. No. 71–1058 (5th Cir., filed Jan. 12, 1972). Its progeny are United States v. Baldassari et al., 338 F. Supp. 904 (M.D.Pa.1972) ; United States v. Cihal et al., 336 F.Supp. 261 (W.D.Pa., 1972) ; United States v. Aquino et al., 336 F.Supp. 737 (E.D.Mich., 1972) ; contra, United States v. King et al., 335 F.Supp. 523 (S.D.Cal.1972, opinion by Judge Leland Nielson). All but the *King* case have resulted in suppressions.

4. The defendants asserted a number of grounds for their Motion to Suppress (generally in the area of alleged lack of probable cause for the wiretap order). We were in the midst of a hearing on the Mo-

tion when the point in question here was interposed. After consideration of *Robinson* and its progeny, all parties agreed to recess until the Court resolved the question of the validity of the Attorney General's authorization. Prior to writing this opinion, we accepted briefs and heard oral argument on this issue.

5. For example, Senator Scott pointed out: "Title III of the bill would authorize carefully circumscribed and strictly controlled electronic surveillance (eavesdropping and wiretaping) by duly authorized law enforcement officials under a Court order procedure for the purpose of investigating specified crimes

history further states specifically that the procedure was intended to conform to the constitutional standards enunciated in *Berger* and Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). See United States v. Baldassari et al., 338 F.Supp. 904, at 905 (M.D. Pa.1972); United States v. Cox, 449 F. 2d 679, 684 (10th Cir. 1971). For the legislative history, *see generally,* U.S. Code Cong. and Admin.News, Cong. 2d Session 1968, vol. 2, pp. 2112 et seq.

■ The Government's first line of defense to the motion rests on its contention that the core of Title III proceedings lie in the neutral judicial determination of probable cause. The Government suggests that this determination of probable cause is the main course as it were in Title III proceedings, and that the authorization which sets them in motion is like the appetizer which can be dispensed with. While we agree (see discussion at IV *infra*), that the judicial probable cause determination is a sine qua non of satisfying the requirements of the Fourth Amendment as enunciated in *Berger* and *Katz,* we do not agree that the authorization procedure is a technical step along the way, scrupulous observance of which can be ignored. For, it is clear to us that the drafters of Title III were equally concerned with the responsibility and, therefore, the identity of the persons initiating the wiretap application and the manner in which they did so. Senate Report 1097,[6] in referring to § 2516(1) states:

"Paragraph (1) provides that the Attorney General, or any Assistant Attorney General of the Department of Justice specifically designated by him,

involving national security and serious offenses."
(Individual Views of Senator Scott, U.S.Code, Cong. and Admin.News, Cong. 2nd Session 1968, Vol. 2, p. 2264).

6. This report, dated April 29, 1968, accompanied Senate Bill 917 and is published in its entirety in United States Code Congressional and Administrative News, 90th Congress—2nd Session, Vol.

may authorize an application for an order authorizing the interception of wire or oral communications. *This provision centralizes in a publicly responsible official subject to the political process the formulation of law enforcement policy on the use of electronic surveillance techniques.* Centralization will avoid the possibility that divergent practices might develop. Should abuses occur, the lines of responsibility lead to an identifiable person. This provision in itself should go a long way toward guaranteeing that no abuses will happen. 1968 U.S. Code Cong. & Adm.News, p. 2185." (emphasis added).

Commenting upon this Report, Judge Clark, speaking for the Fifth Circuit in the leading case of United States v. Robinson et al., Crim. No. 71–1058 (5th Cir., filed Jan. 12, 1972), trenchantly stated:

"By expressing its intention that only 'a publicly responsible official subject to the political process' could initiate a wiretap application, Congress wanted to make certain that every such matter would have the *personal* attention of an individual appointed by the President and confirmed by the Senate.[6] Its reasoning was that this nar-

6. In the case of the Attorney General, *see* 28 U.S.C.A. § 503. As to the nine Assistant Attorneys General, *see* . . . 28 U.S.C.A. § 506.

row limitation to top department officials would (1) establish a unitary policy in the use of the awesome power conferred, and (2) require that power to be exercised with a circumspection re-enforced by ready identifiability of he who was responsible for its use, thus maximizing the guarantee that

2 (1968). The text of this Senate Bill, which was substituted for a 1967 House Bill, H.R. 5037, entitled "Law Enforcement and Criminal Justice Assistance Act of 1967", substantially revised the concepts of that prior proposal. The Senate Bill which Senate Report 1097 describes contains the language finally enacted by the Congress. United States v. Robinson, *supra,* at 5.

abuses would not occur." United States v. Robinson, *supra* at 5–6.

At a later point in the opinion, in comparing the power to authorize the initiation of wiretap proceedings with the power to grant immunity from prosecution to witnesses whose testimony is necessary to the public interest (which has been held to be delegable by the Attorney General under 28 U.S.C. § 510 [7] (see discussion *infra*), Judge Clark observed:

> "The decision to ask a court to compel testimony with a consequent grant of immunity does not involve an action even approaching the gravity which attaches to the decision to apply for permission to engage in secret electronic surveillance. Congress could justifiably feel it important that the public know that only an identifiable person subject to the political process could trigger the unknown, unseen, unheard intrusion into private affairs that are constitutionally protected against unreasonable searches, entitled to freedom from self-incriminatory results, and presumptively innocent. With equal propriety, Congress could choose to permit a broader number of properly designated persons to ask a court to require a witness to relate facts he knows and, as a price therefor, relieve him of prosecution for his involvement and past actions which are often already fully known to the law and many times the subject of public charges." (footnote omitted). United States v. Robinson, *supra* at 8–9.

We concur in the *Robinson* court's view of the legislative history of Title III's wiretap provisions.

## II.

The factual record before us on the question involved consists principally of affidavits submitted by the Government from Attorney General Mitchell, Executive Assistant Attorney General Lindenbaum, Assistant Attorney General Wilson and Deputy Assistant Attorney General Henry Petersen. Unlike the Lindenbaum and Petersen affidavits which are specific, the affidavits of the Attorney General and Mr. Wilson are in the nature of statements of general policy related to the subject of wiretap authorizations and were intended to cover the entire series of cases of which this is but one; [8] they do not discuss the facts of this particular case. The substance of the affidavits may be summarized as follows.

The affidavit of Attorney General Mitchell which was dated February 18, 1972 discusses the procedure used by the Department of Justice in processing wiretap requests. Mr. Mitchell states that, although 18 U.S.C. 2516(1) permitted him to delegate to certain officials the power to authorize wiretaps, he nonetheless required that all requests be forwarded to him for his personal consideration. The requests were accompanied by the recommendations of the Executive Assistant Attorney General, Sol Lindenbaum. If the Attorney General approved the request, he would indicate his approval by initiating a memorandum to the Assistant Attorney General in charge of the Criminal Division specially designating him to authorize the application. The crucial segment of the Attorney General's affidavit is the following:

> "Somewhat more than a year after this Department first utilized the provisions of Title III, I verbally authorized my Executive Assistant to act on my behalf on requests that might be transmitted by the Criminal Division at a time when I was not available to act on them. I gave him this authority in the light of his familiarity with my policies and with my decisions on all the requests that had been previously submitted to me. My subsequent re-

---

7. December 1968 Grand Jury v. United States, 420 F.2d 1201 (7th Cir. 1970). *Cf.* In Matter Of Horn, 458 F.2d 468 (3d Cir., filed March 14, 1972).

8. The Wilson affidavit also contains reference to a specific Florida case. The Mitchell affidavit was a copy of the one filed in United States v. King, 335 F. Supp. 523 (S.D.Cal.1972).

view of cases in which he approved requests on my behalf confirmed that he followed my policies."

The Attorney General adds that he personally authorized all applications made after November 20, 1971.

Mr. Lindenbaum's affidavit is dated February 4, 1972. After reiterating the Attorney General's desire to consider personally all requests, Mr. Lindenbaum states that, since February 1969, he has routinely reviewed the requests, having become familiar with the statutory requirements and the actions taken by the Attorney General. He states that on March 12, 1971 and April 2, 1971, the requests (for original authorization and extension) in this case were received in the Attorney General's office along with a recommendation for approval by the Criminal Division. He goes on to describe the procedure that was followed:

"In each instance, I reviewed the submitted material, concluded that the request satisfied the requirements of the statute and also concluded, from my knowledge of the Attorney General's actions on previous cases, that he would approve the request if submitted to him. Because the Attorney General was not available on either occasstion [sic], I approved each of the requests pursuant to the authorization which he had given to me to act in the circumstances and caused his initials to be placed on memoranda to Will Wilson. The memoranda approved requests that authorization be given to Raymond E. Makowski to make applications for interception orders. . . ."

The affidavit of Henry Petersen, a Deputy Assistant Attorney General in the Criminal Division, under Mr. Wilson dated February 4, 1972, relates the procedure followed in the present case before it reached the Attorney General's office. The requests were received by the Department of Justice on March 9, 1971 and April 2, 1971, and both requests were reviewed

"in a special unit of the Organized Crime and Racketeering Section of the Criminal Division by attorneys whose primary function was to review the entire matter for forms and substance with particular emphasis on assuring strict adherence to the required statutory, judicial, and Constitutional standards."

Recommendations for approval of the requests were given by attorneys of the above mentioned Unit and by Deputy Chiefs of the Organized Crime and Racketeering Section. The files were then sent to Mr. Petersen who, after examining them, forwarded them to the Attorney General's Office with a detailed recommendation of approval. Following the approval by the Attorney General's Office, the Criminal Division sent letters dated March 12, 1971 and April 2, 1971 advising Mr. Makowski of the authorization (the original authorization and extension). Mr. Petersen describes the authorization issued by the Criminal Division after receiving approval from the Attorney General's Office as follows:

"I signed Will Wilson's name to the letters of March 12 and April 2, 1971, in accordance with the authorization of Will Wilson and the standard procedures of the Criminal Division. I regarded the signing of Will Wilson's name as a ministerial act, because Will Wilson had authorized me to sign his name to and dispatch such a letter of authorization in every instance in which the request had been favorably acted upon in the Office of the Attorney General. Will Wilson did not examine either file or expressly authorize either application. . . ."

The affidavit of Mr. Wilson, who was the Assistant Attorney General in charge of the Criminal Division in March and April of 1971, is dated September 15, 1971 and, as noted above, does not refer specifically to this case. Mr. Wilson describes the operating procedure in effect in March and April of 1971 as follows:

"I have authorized Deputy Assistant Attorney General Henry E. Petersen and Deputy Assistant Attorney General Harold Shapiro to sign my name to letters of authorization for

application to United States District Courts for orders under Title 18, United States Code, Section 2518, after such application has been approved by the Attorney General."

To the record afforded by the affidavits, the Government added a statement in open court to the effect that it agreed that neither Mr. Mitchell nor Mr. Wilson were ever made aware of the pendency of the wiretap authorizations and applications in question in this case, and that they were never consulted at any time with respect thereto.

### III.

■■ Our review of the facts makes it clear that the congressional command that the wiretap procedure be authorized by the Attorney General or an Assistant Attorney General specially designated by him was not complied with in this case. Although the facts were apparently carefully considered by the Organized Crime and Racketeering Section and by Messrs. Petersen and Lindenbaum, there was no review, much less the requisite sentient review of the matter by Mr. Mitchell or by anyone within the express parameters of the statute. Sol Lindenbaum and Henry Petersen do not come within the orbit of the legislative decree: neither was appointed by the President and confirmed by the Sen-

ate. Moreover, it is insufficient to allege that Mr. Mitchell (or Mr. Wilson, had he been properly designated) would have concurred in the decision to proceed had he (they) been consulted, or that their approval would be "routine". Such a notion would flout the statutory scheme.[9]

■ If the Government's position is to prevail, it can do so only on the basis that there is statutory authority for the delegation of the Attorney General's power to Mr. Lindenbaum or to Mr. Petersen. The Government has argued here, as it has in *Robinson* and its progeny (see fn. 3, *supra*) that the power of the Attorney General to authorize a wiretap application is in fact so delegable pursuant to 28 U.S.C. § 510.[10] However, the *Robinson* court effectively addressed itself to that contention:

"Since § 510 already existed when § 2516(1) was enacted, the inclusion in the later statute of language specifying who the Attorney General could specially designate to perform the instigating function would have been surplusage if Congress meant that the Attorney General could authorize the performance of this duty by any officer, employee or agency of his department. We therefore conclude that § 2516(1) was intended to operate as a limit upon § 510, rather than that

9. Although it is of secondary importance in view of the lack of seminal authorization by the Attorney General, had Mr. Wilson been conferred the power to authorize the applications, the affixing of his signature by Mr. Petersen appears to us to be more than a "ministerial act" as the Government contends. In United States v. Aquino, *supra* (the original application) and United States v. Iannelli, 339 F.Supp. 171 (W.D.Pa., filed Jan. 13, 1972), the courts found that the Attorney General had in fact initiated the memorandum to Mr. Wilson. They concluded that the requisites of 2516(1) were thereby satisfied, notwithstanding the allegation that Will Wilson's signature was affixed by one of his deputy assistants. Such holdings are not free from doubt, since the memorandum would have to be analyzed to determine if the Attorney General had actually authorized the wire-

tap or had only specially designated an Assistant Attorney General to authorize it; in other words, in each case the court must determine if the Assistant Attorney General was delegated the power to authorize, or whether the Attorney General had authorized the wiretap and the Assistant Attorney General merely conveyed that notice of that decision. In this case, because of the defect in the initial authorization by the Attorney General, we need not make that determination.

10. 28 U.S.C. § 510 states:
"The Attorney General may from time to time make such provisions as he considers appropriate authorizing the performance by any other officer, employee, or agency of the Department of Justice of any function of the Attorney General."

§ 510 broadened the circumscribed authority set out in § 2516(1).

The legislative history of § 2516(1) as well as simple logic, compel the conclusion that § 510 must not be read as liberalizing the narrow limits Congress placed on who could initiate the wiretap process. . . ." United States v. Robinson, *supra* at 4.

We agree with *Robinson*.[11] The Government has, however, added new ammunition to the delegation argument.

The Government's new arguments are prefaced by reference to the obvious impossibility of one man's personally exercising *all* the statutory functions of an office such as Attorney General. The burdens of the Attorney Generalship are unquestionably onerous, if not overwhelming, and the Government, proceeding from the necessity of delegation of all sorts of duties by busy public officials and the special personal relationship between the Attorney General and his Executive Assistant, has contended that we should: (1) treat Mr. Lindenbaum as the Attorney General's "alter ego" with respect to matters such as these when the Attorney General is not available;[12] and (2) find that the delegation to Mr. Lindenbaum constitutes a satisfaction of the statutory command. The argument is summarized as follows:

"As his accompanying affidavit shows, Sol Lindenbaum is in frequent contact with the Attorney General, and acts under his direction and approval in these matters. The practice of having a personal aide in whom an official must and does repose total confidence is well known and widely accepted not only in the executive branch, but in the legislative branch as well. (*c. f.*, United States v. Joe

Doe, Mike Gravel, United States Senator, Intervenor [455 F.2d 753 at 760]. Nos. 71–1331, 71–1332 and 71–1335 (1st Cir.), decided January 7, 1972, slip op. at 11–12). The nature of such a relationship demands that the aide and the officer be treated as one, id. Congress was, of course, well aware of this practice and should be presumed to have legislated with it in mind." (Government Brief p. 4).

We do not doubt that Mr. Lindenbaum is a highly responsible official. It may also be, as the Government argues, that in the person of Mr. Lindenbaum there is a centralized repository for application of a consistent policy towards wire interception. However, the Government's contentions that Mr. Lindenbaum's role constitutes a fulfillment of statutory policy fail in a most significant respect. For, as we understand this unique area, Congress has made form as important as substance; Congress was concerned not just with the integrity of the internal Justice Department review of agency wiretap requests, but also with the identity and status of the person initiating the authorization to apply for court approval. While Congress conferred upon the Justice Department the *authority* to initiate the wiretap process, it is clear to us that it deemed *implementation* of that awesome power to be a matter of high national policy. Accordingly, the approval of Mr. Lindenbaum, not an official subject to the "political process", does not fill the congressional bill.

■ Another problem with the Government's "alter ego" argument is that it does not stop with Mr. Lindenbaum, but could be extended to anyone in the Department of Justice with any degree of stature. In this fashion, the Govern-

---

11. We also agree with Judge Kennedy, speaking in the *Aquino* case, that as a matter of statutory construction, the specific statute (§ 2516(1)) must prevail over the general (§ 510). United States v. Aquino, *supra*, 336 F.Supp. at 740.

12. The duties of Executive Assistant to the Attorney General are contained in 28 CFR § 0.6(a):

"Assist the Attorney General in the review of opinions, interpretations, decisions of the Board of Immigration Appeals, applications for pardon and other forms of Executive clemency, antitrust complaints, contracts, agreements, and proposed offers in compromise, and other matters submitted for the Attorney General's action."

ment, by determining who qualifies as the Attorney General's "alter ego", could, in effect, dilute the standard which Congress tried to create. Although not suggested by the facts of this case, we note that in the absence of stringent application of the rule, a laxity could develop which might lead to excesses or abuse. As we view it, the necessity for strict compliance with the statute in a wiretap situation stems just as much from the precedent-setting example of condoning laxity which could lead to further laxity in years to come, with serious consequences to personal liberties, as from concern over the rights of the accused in a given case.

It seems to us that the Attorney General could have satisfied the statutory requirements had he specifically and in writing designated Mr. Wilson, the Presidentially appointed, Senatorially confirmed Assistant Attorney General in charge of the Criminal Division, to authorize the initiation of wiretap requests. This would have measurably relieved the Attorney General's burdens, but he chose not to do so.[13]

The Government advances another argument not raised in the other cases. It is that if Congress had desired the authority in question to be non-delegable, it would have expressly stated so, in the same manner that it did in amending Title 18 U.S.C. § 245(a) during the same session of Congress in which 18 U.S.C. § 2516 was enacted. Section 245(a) (1), which relates to criminal prosecutions for wilful violations of civil rights reads in part (as thus amended):

> "No prosecution of any offense described in this section shall be undertaken by the United States except upon the certification in writing of the Attorney General or the Deputy Attorney General that in his judgment a prosecution by the United States is in the public interest and necessary to secure substantial jus-

tice, which function of certification may not be delegated."

However, this argument, too, falls short of the mark. Whatever may be said of this section, it cannot be deemed to be part of the legislative history of Title III, the import of which, as we have said, is quite clear. Moreover, the impetus which this argument would purportedly give to the Government's § 510 delegation argument really proves too much; the power to initiate wiretaps could then be delegated to anyone in the Justice Department, which is clearly an untenable position in light of the legislative history of Title III.[14]

Accordingly, we must reject the Government's contention that the wiretaps in this case may be sustained as an exercise of delegated power.

## IV.

The Government has raised another argument for the first time in this series of cases. It is that, even assuming that the wire interceptions were not properly authorized, we should not invoke the "drastic remedy" of suppression of evidence under the exclusionary rule:

> "[W]hile the exclusionary rule serves a valuable purpose in cases of violations of Constitutional or other substantial rights, it should not be inflexibly extended to cover all deviations from norms regardless of the good faith of the government and the merely technical nature of the deviation. . . . No real deterrent interest would be served by suppressing the evidence in this case, since the object of the government at all times has been to comply with the statutory requirements." Government's Brief, p. 6.

This argument misconceives the nature of the question before us. The exclusionary rule is constitutional in origin. Weeks v. United States, 232 U.S.

---

13. Congress could, of course, grant him relief as well by expanding the scope of his delegable power in this area.

14. Cf. Benanti v. United States, 355 U.S. 96, 78 S.Ct. 155, 2 L.Ed.2d 126 (1957); United States v. Iannelli, 339 F.Supp. 171 (W.D.Pa. filed Jan. 13, 1972).

383, 34 S.Ct. 341, 58 L.Ed. 652 (1914); Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). The raison d'être of the exclusionary rule is to provide "teeth" for the Fourth Amendment. In the wiretapping context, the requisites of the Fourth Amendment (cf. Katz and Berger) are met in the main by compliance with the provisions of § 2518. What we are dealing with is a separate statutory requirement (§ 2516 (1)),[14] which is not mandated by Katz and Berger, but which Congress required as a further safeguard in view of the awesomeness of the wiretap power.

The "exclusionary rule" has also been construed in terms of the supervisory power of the federal courts over matters in evidence before them.[15] However, to repeat, what is before us is a statutory matter, and we know of no authority vested in a lower federal court to ignore a statutory precept on the basis of some inchoate supervisory power.

### V.

The Government makes a final argument not heretofore advanced in this series of cases. It is that the wire interception contents cannot be suppressed because of the language of § 2518(10) (a), which states, *inter alia*:

> "Any aggrieved person in any trial . . . may move to suppress the contents of any intercepted wire or oral communication, or evidence derived therefrom, on the grounds that—
>
> (i) the communication was unlawfully intercepted;
>
> (ii) the order of authorization or approval under which it was intercepted is insufficient on its face; or
>
> (iii) the interception was not made in conformity with the order of authorization or approval."

The Government contends:

> "Any technical violation in the authorization for the application does not

come within these grounds, unless the word 'unlawfully' in (i) is given the broadest possible interpretation. If such a broad meaning were intended, however, then there would have been no need for specifying the other two grounds since they, too, would be encompassed in that meaning." Government's Brief, p. 7.

The Government overlooks the fact that Congress has written an exclusionary rule into the statute in the form of § 2515, which states, *inter alia*:

> "Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial . . . before any court . . . *if the disclosure of that information would be in violation of this chapter.*" (emphasis added).

The interrelationship of § 2515 and § 2518(10) (a) is revealed in the legislative history.

> "Section 2515 of the new chapter imposes an evidentiary sanction to compel compliance with the other prohibitions of the chapter. . . . *The provision must, of course, be read in light of section § 2518(10)(a) discussed below, which defines the class entitled to make a motion to suppress.* . . . The provision thus forms an integral part of the system of limitations designed to protect privacy. Along with the criminal and civil remedies, it should serve to guarantee that the *standards of the new chapter* will sharply curtail the unlawful interception of wire and oral communications." (emphasis added). U.S.Code Cong. and Adm. News, *supra* at pp. 2184–85.

Furthermore, § 2518(10) (a) "provides the remedy for the right created by section 2515." U.S.Code Cong. and Adm. News, supra at p. 2195.

---

15. Whether the origin of the exclusionary rule is the Constitution or a rule of evidence, the nexus with the Fourth Amendment is the same. Even if it were a rule of evidence, it still is applied in federal cases; the difference in characterization concerns whether the exclusionary rule must be applied to the states.

■ In order to determine if "the disclosure of that information [the contents of the interception] would be in violation of this chapter", we must look to §§ 2511 and 2517. *Inter alia*, § 2511 prohibits any willful use of an interception "[e]xcept as otherwise specifically provided in this chapter." § 2517(3) is an exception to § 2511 and allows the disclosure of the contents of a wiretap at trial if "intercepted in accordance with the provisions of this chapter." Since the interception in this case was not in accordance with the provisions of this chapter, *i. e.*, § 2516(1), the use at trial would not fall within the exception of § 2517. Therefore, we conclude that disclosure of the contents of the wiretap would be in violation of this chapter, *i. e.*, a willful use of an interception under § 2511, and that the statutory exclusionary rule would apply here.

## VI.

The foregoing analysis compels the conclusion that the contents of the electronically intercepted telephone communications must be suppressed in this case. This conclusion is not unaccompanied by mixed feelings. We do not prejudge the case by the observation that it is indeed unfortunate that the failure to obtain proper authorization will apparently deprive the Government of an opportunity to at least attempt to prove the defendants' guilt.[16] Neither are we unmoved by the fact that a prophylactic result has been achieved by *Robinson* and its progeny, for the Justice Department is now apparently scrupulously following the Act. But we are not at liberty to apply a prospective rule. The interception was not in accordance with the Act, and, in terms of the intention of the legislative drafters ran afoul of provisions which are at the core of the safeguards therein enshrined.

16. This result will not attain, of course, if the Government can produce sufficient evidence other than wiretap evidence to go to trial and get to the jury.