## STATE v. BRIAN J. FRINK AND ANOTHER.

206 N. W. 2d 664.

April 13, 1973—No. 43300.

*William D. Sommerness,* Assistant District Public Defender, for relator Frink.

*McNulty & Stege* and *William L. Stege,* for relator Mix.

*Keith M. Brownell,* County Attorney, and *Robert Lucas,* Assistant County Attorney, for respondent.

*William B. Randall,* Ramsey County Attorney, and *Steven C. DeCoster,* Assistant Ramsey County Attorney, for Minnesota County Attorneys Association, amicus curiae.

OTIS, JUSTICE.

Defendants were charged on October 30, 1970, with possession of narcotic drugs consisting of heroin, hashish, and marijuana, in violation of Minn. St. 1969, §§ 618.01 and 618.02. The

offenses were felonies under Minn. St. 1969, § 618.21.[1] In June 1971, prior to arraignment in the district court, the county attorney and counsel for defendants presented to this court a petition for a writ of prohibition which raised the issue of whether evidence obtained by intercepting messages transmitted over the telephone of defendant Robert Mix would be admissible in the pending trial. By stipulation of the parties, we issued the writ enjoining the district court from proceeding until further order of the court. The matter was thereafter heard en banc. Because the county attorney did not himself apply to the court for the warrant authorizing the interception of the communications on which the charge is based, as required by Minn. St. 626A.05, we have concluded that the evidence thus obtained is inadmissible under § 626A.11.

On October 16, 1970, Jerome G. Arnold, an assistant county attorney of St. Louis County, applied to the district court for a search warrant authorizing members of the Duluth Police Department to intercept telephone communications at Apartment 6, 307 East Third Street, in the city of Duluth. The warrant was issued. The telephone was listed in the name of defendant Mix. On October 26, Mr. Arnold obtained from the district court a second warrant extending the interception for an additional 10 days. As a result of conversations thus monitored, the police obtained a warrant which authorized them to search an automobile occupied by defendants Mix and Brian Frink at 57th Avenue West and Cody Street in the city of Duluth, on October 30. In conducting that search, the police found the narcotics which led to this prosecution.

Motions to suppress the evidence thus seized were based in part on a failure to comply with § 626A.05 of the Privacy of Communications Act, which requires that applications for interception be initiated either by the attorney general or by a county attorney. In denying the motions, the trial court held:

---

[1] The statutes have been repealed by L. 1971, c. 937, § 22, and have been replaced by Minn. St. 152.01, 152.02, 152.09, and 152.15.

"* * * It is further the ruling of this Court that Jerome G. Arnold, an Assistant County Attorney, was a proper person to make application for an order to intercept communications within the meaning of M.S.A. Chapter 626A and Section 388.10."[2]

The Minnesota Privacy of Communications Act which became effective July 1, 1969, was adopted in response to Title III of the Omnibus Crime Control and Safe Streets Act enacted by Congress in 1968 and codified as 18 USCA, §§ 2510 to 2520. The Federal provisions in turn were prompted by efforts to formulate statutory rules which would implement the mandates of the Fourth Amendment suggested by the United States Supreme Court in Berger v. New York, 388 U. S. 41, 87 S. Ct. 1873, 18 L. ed. 2d 1040 (1967); and Katz v. United States, 389 U. S. 347, 88 S. Ct. 507, 19 L. ed. 2d 576 (1967).

In any consideration of the application of these statutes, it is essential to have in mind that both the state and Federal acts are basically criminal laws to punish the unauthorized interception of wire or oral communications, authorizing imprisonment up to 5 years and fines up to $10,000 for violations. Both acts are designed to enforce the rights conferred by U. S. Const. Amend. IV. That amendment provides:

"The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated, and no warrant shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized."

The right of privacy and freedom from intrusion which the Fourth Amendment promises have not always been enjoyed by English-speaking people. It was not until 1765 that the Lord

---

[2] At the time this order was entered, none of the cases on which our decision is based bearing on the question of the construction of Minn. St. 626A.05 had been decided and hence were not available to the trial court.

Chief Justice of England, Lord Camden, struck down as unlawful general warrants issued by Lord Halifax, one of the principal secretaries of state, in Entick v. Carrington, 19 Howell, St. Tr. 1029. Lord Camden denounced such warrants as intrusions which are "subversive of all the comforts of society." Id. 1066.[3] The United States Supreme Court in Boyd v. United States, 116 U. S. 616, 630, 6 S. Ct. 524, 532, 29 L. ed. 746, 751 (1886), observed that the Entick case laid down principles which affected "the very essence of constitutional liberty and security. * * * they apply to all invasions on the part of the government and its employes of the sanctity of a man's home and the privacies of life." In holding a Federal customs statute unconstitutional, the court concluded by saying (116 U. S. 635, 6 S. Ct. 535, 29 L. ed. 752):

"* * * It may be that it is the obnoxious thing in its mildest and least repulsive form; but illegitimate and unconstitutional practices get their first footing in that way, namely, by silent approaches and slight deviations from legal modes of procedure. * * * It is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon."

Although the United States Supreme Court upheld a telephone wiretap in Olmstead v. United States, 277 U. S. 438, 48 S. Ct. 564, 72 L. ed. 944 (1928), that decision prompted much-quoted dis-

---

[3] Blackstone included eavesdropping in the offenses treated as common nuisances which he defined as "inconvenient or troublesome offences, as annoy the whole community in general, and not merely some particular person; and therefore are indictable only, and not actionable * * *." 2 Cooley, Blackstone (4 ed.) p. 1338.

Eavesdroppers are those who "listen under walls or windows or the eaves of a house to hearken after discourse, and thereupon to frame slanderous and mischievous tales, are a common nuisance and presentable at the court-leet: $(u)$ or are indictable at the sessions, and punishable by fine and finding sureties for their good behaviour. $(v)$" Id. p. 1340.

sents on the part of Mr. Justice Holmes and Mr. Justice Brandeis whose views ultimately prevailed when the court overruled Olmstead in Katz v. United States, 389 U. S. 347, 88 S. Ct. 507, 19 L. ed. 2d 576 (1967). In condemning wiretapping as a violation of the Fourth Amendment, Mr. Justice Holmes said (277 U. S. 470, 48 S. Ct. 575, 72 L. ed. 953) :

"* * * We have to choose, and for my part I think it a less evil that some criminals should escape than that the Government should play an ignoble part.

"For those who agree with me, no distinction can be taken between the Government as prosecutor and the Government as judge. If the existing code does not permit district attorneys to have a hand in such dirty business it does not permit the judge to allow such inequities to succeed."

After referring to the Entick case and the writs of assistance which played a part in provoking the American Revolution,[4] Mr. Justice Brandeis concluded with this observation (277 U. S. 475, 48 S. Ct. 571, 72 L. ed. 955) :

"* * * The evil incident to invasion of the privacy of the telephone is far greater than that involved in tampering with the mails. Whenever a telephone line is tapped, the privacy of the persons at both ends of the line is invaded and all conversations between them upon any subject, and although proper, confidential and privileged, may be overheard. Moreover, the tapping of one man's telephone line involves the tapping of the telephone of every other person whom he may call or who may call him. As a means of espionage, writs of assistance and general warrants are but puny instruments of tyranny and oppression when compared with wire-tapping."

In a series of recent cases the rules which were subsequently codified into the Federal wiretap statutes, 18 USCA, c. 119, were

---

[4] See, United States v. United States District Court, 407 U. S. 297, 328, note 6, 92 S. Ct. 2125, 2142, 32 L. ed. 2d 752, 773 (1972) (Douglas, J., concurring).

enunciated by the United States Supreme Court. A New York eavesdropping statute was held unconstitutional in Berger v. New York, 388 U. S. 41, 62, 87 S. Ct. 1873, 1885, 18 L. ed. 2d 1040, 1054, where the court said:

"* * * [W]e cannot forgive the requirements of the Fourth Amendment in the name of law enforcement. This is no formality that we require today but a fundamental rule that has long been recognized as basic to the privacy of every home in America. * * * [I]t is not asking too much that officers be required to comply with the basic command of the Fourth Amendment before the innermost secrets of one's home or office are invaded. Few threats to liberty exist which are greater than that posed by the use of eavesdropping devices."

In Katz v. United States, supra, evidence was held inadmissible because it was obtained by an unauthorized tap of a telephone booth. There, the court said that whether a person is in his home, office, hotel room, or a telephone booth, "he is entitled to know that he will remain free from unreasonable searches and seizures." 389 U. S. 359, 88 S. Ct. 515, 19 L. ed. 2d 586.

Two other cases deserve comment. United States v. United States District Court, 407 U. S. 297, 92 S. Ct. 2125, 32 L. ed. 2d 752 (1972); and Gelbard v. United States, 408 U. S. 41, 92 S. Ct. 2357, 33 L. ed. 2d 179 (1972). In the first case, the court held that evidence secured by the President through electronic surveillance without a court order had been obtained in violation of the Fourth Amendment and was inadmissible. The court observed that the use of electronic surveillance is not a welcome development even when employed with restraint and under judicial supervision.

"* * * There is, understandably, a deep-seated uneasiness and apprehension that this capability will be used to intrude upon cherished privacy of law-abiding citizens. We look to the Bill of Rights to safeguard this privacy. Though physical entry of the home is the chief evil against which the wording of the

Fourth Amendment is directed, its broader spirit now shields private speech from unreasonable surveillance." 407 U. S. 312, 92 S. Ct. 2134, 32 L. ed. 2d 763.

In Gelbard, where a witness refused to testify before a grand jury, the exclusionary provisions of the Federal wiretap statute, 18 USCA, §§ 2510 to 2520, were applied in a contempt matter because the information which was the subject of the inquiry was obtained by illegal wiretapping. The applicable statute, 18 USCA, § 2515, provides as follows:

"Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding in or before any court, grand jury, department, officer, agency, regulatory body, legislative committee, or other authority of the United States, a State, or a political subdivision thereof if the disclosure of that information would be in violation of this chapter."

In holding that the act was broad enough to afford the witness protection if the surveillance was in violation of the act, the court commented on congressional policy as follows (408 U. S. 47, 92 S. Ct. 2361, 33 L. ed. 2d 186):

"The unequivocal language of § 2515 expresses the fundamental policy adopted by Congress on the subject of wiretapping and electronic surveillance. As the congressional findings for Title III make plain, that policy is strictly to limit the employment of those techniques of acquiring information:

'To safeguard the privacy of innocent persons, the interception of wire or oral communications where none of the parties to the communication has consented to the interception should be allowed only when authorized by a court of competent jurisdiction and should remain under the control and supervision of the authorizing court. Interception of wire and oral communications should further be limited to certain major types of offenses and specific categories of crime with assurances that the inter-

ception is justified and that the information obtained thereby will not be misused.' § 801(d), 82 Stat. 211.

"The Senate committee report that accompanied Title III underscores the congressional policy:

'Title III has as its dual purpose (1) protecting the privacy of wire and oral communications, and (2) delineating on a uniform basis the circumstances and conditions under which the interception of wire and oral communications may be authorized. To assure the privacy of oral and wire communications, title III prohibits all wiretapping and electronic surveillance by persons other than duly authorized law enforcement officers engaged in the investigation or prevention of specified types of serious crimes, and only after authorization of a court order obtained after a showing and finding of probable cause.' S. Rep. No. 1097, 90th Cong., 2d Sess., 66 (1968).

"Hence, although Title III authorizes invasions of individual privacy under certain circumstances, the protection of privacy was an overriding congressional concern. Indeed, the congressional findings articulate clearly the intent to utilize the evidentiary prohibition of § 2515 to enforce the limitations imposed by Title III upon wiretapping and electronic surveillance:

'In order to protect effectively the privacy of wire and oral communications, to protect the integrity of court and administrative proceedings, and to prevent the obstruction of interstate commerce, it is necessary for Congress to define on a uniform basis the circumstances and conditions under which the interception of wire and oral communications may be authorized, to prohibit any unauthorized interception of such communications, and *the use of the contents thereof in evidence in courts and administrative proceedings.*' § 801(b), 82 Stat. 211 (emphasis added).

And the Senate report, like the congressional findings, specifically addressed itself to the enforcement, by means of § 2515, of the limitations upon invasions of individual privacy:

'Virtually all concede that the use of wiretapping or electronic surveillance techniques by private unauthorized hands has little justification where communications are intercepted without the consent of one of the participants. No one quarrels with the proposition that the unauthorized use of these techniques by law enforcement agents should be prohibited. . . . Only by striking at all aspects of the problem can privacy be adequately protected. The prohibition, too, must be enforced with all appropriate sanctions. Criminal penalties have their part to play. But other remedies must be afforded the victim of an unlawful invasion of privacy. Provision must be made for civil recourse for damages. *The perpetrator must be denied the fruits of his unlawful actions in civil and criminal proceedings.* Each of these objectives is sought by the proposed legislation.' S. Rep. No. 1097, *supra,* at 69 (emphasis added).

"Section 2515 is thus central to the legislative scheme. Its importance as a protection for 'the victim of an unlawful invasion of privacy' could not be more clear."

The interaction between the Federal act and similar state statutes is well explicated in State v. Siegel, 13 Md. App. 444, 459, 285 A. 2d 671, 680 (1971). The Federal act is not self-executing as to the states. All state wiretaps are foreclosed under Federal law unless authorized by a similar state statute which may be more restrictive but not less so than the Federal act. Siegel holds that only the principal prosecuting attorney of the state or the principal prosecuting attorney of any of its subdivisions may apply for an order of interception, without which the wiretap is in violation of Federal law. The applicable Federal statute, 18 USCA, § 2516(2), provides in part as follows:

"The principal prosecuting attorney of any State, *or the principal prosecuting attorney of any political subdivision thereof,* if such attorney is authorized by a statute of that State to make application to a State court judge of competent jurisdiction for an order authorizing or approving the interception of wire or

oral communications, may apply to such judge for, and such judge may grant in conformity with section 2518 of this chapter and with the applicable State statute an order authorizing, or approving the interception of wire or oral communications by investigative or law enforcement officers having responsibility for the investigation of the offense as to which the application is made * * *." (Italics supplied.)

The corresponding section of the Minnesota Privacy of Communications Act, § 626A.05, subd. 1, provides:

"The attorney general or *a county attorney of any county* may make application as provided in section 626A.06, to a judge of the district court or of the supreme court for a warrant authorizing or approving the interception of wire or oral communications by investigative or law enforcement officers having responsibility for the investigation of the offense as to which the application is made. No court commissioner shall issue a warrant under sections 626A.01 to 626A.23." (Italics supplied.)

With respect to the narrow issue here before us, it is undisputed that the applications for the wiretap of the telephone of defendant Mix were prepared, executed, and presented to the trial court on October 16 and October 26, 1970, without the knowledge or consent of John Arko, then the St. Louis County Attorney. The state contends, however, that Minn. St. 388.10 authorized Jerome Arnold, an assistant county attorney, to execute the application on behalf of the county attorney. We do not agree. That statute, which long antedated c. 626A, provides in part as follows:

"The county attorney of any county in this state who has no assistant is hereby authorized to appoint, with the consent of the county board of the county, one or more attorneys to assist him in the performance of his duties. Each assistant shall have the same duties and be subject to the same liabilities as the county attorney and hold office during the pleasure of the county attorney."

Although, as we have indicated, when the issue was presented to the trial court, there were no reported cases on either side of the question, the Federal courts have subsequently been inundated with litigation which has led to decisions squarely holding that the responsibilities vested in the persons designated in the Federal statute could not be delegated to anyone except those expressly specified therein.

The leading authority on the question of initiating wiretap procedures is United States v. Robinson, 468 F. 2d 189 (5 Cir.), decided on January 12, 1972. Although that case has been cited in nearly every decision which followed it, a majority of the judges of the Fifth Circuit Court of Appeals sitting en banc remanded the case to the district court on January 16, 1973, "for an expedited evidentiary hearing to determine whether the wire tap applications in this case were properly authorized under 18 U.S.C.A. § 2516(1)." United States v. Robinson, 472 F. 2d 973, 974. Under the Federal statute, 18 USCA, § 2516(1), "The Attorney General, *or any Assistant Attorney General specially designated by the Attorney General,* may authorize an application to a Federal judge of competent jurisdiction for, and such judge may grant in conformity with section 2518 of this chapter an order authorizing or approving the interception of wire or oral communications by the Federal Bureau of Investigation, or a Federal agency having responsibility for the investigation of the offense as to which the application is made * * *." (Italics supplied.) Section 2518 authorizes the suppression of any evidence based on a communication which was unlawfully intercepted.

Significantly, the Fifth Circuit took no issue with the rules adopted by the division which initially heard the case. It is obvious, however, that the court recognized the enormous impact its decision would have on pending matters dealing with the same problem. Federal cases which have passed on the matter and those still pending in Federal courts where the same issue is involved were cited in the court's opinions. The majority made

it clear that they were reluctant to resolve so critical an issue on the affidavits furnished by the attorney general's office without a full evidentiary hearing.

The facts which the Fifth Circuit had before it when the Robinson case was initially decided are these. The only evidence on which defendants were convicted was obtained by two wiretaps. The application to the district court for the wiretaps was not in either case specifically authorized by the attorney general or any assistant attorney general designated by him as required by § 2516. A deputy assistant attorney general subscribed an assistant attorney general's name to the application pursuant to blanket authority given by the attorney general to an executive assistant. This delegation of authority the government sought to justify by reference to 28 USCA, § 510, which reads as follows:

"The Attorney General may from time to time make such provisions as he considers appropriate authorizing the performance by any other officer, employee, or agency of the Department of Justice of any function of the Attorney General."

The court pointed out that § 510 had already been enacted when 18 USCA, § 2516, was adopted and held that § 2516 limited the application of § 510. In reaching this conclusion, the court referred to Senate Report 1097, which recited that § 2516—

"* * * centralizes in a publicly responsible official subject to the political process the formulation of law enforcement policy on the use of electronic surveillance techniques. Centralization will avoid the possibility that divergent practices might develop. Should abuses occur, the lines of responsibility lead to an identifiable person. This provision in itself should go a long way toward guaranteeing that no abuses will happen." 1968 U. S. Code Cong. & Adm. News, pp. 2112, 2185.

The court found a congressional intent to make certain that every such matter would have the *personal* attention of an individual appointed by the President and confirmed by the Senate.

It reasoned that by narrowly limiting this responsibility to top department officials the law (1) would establish a unitary policy in the use of the power conferred, and (2) would require that it be exercised with circumspection, reenforced by making the person responsible for its use identifiable in order to guarantee as far as possible that abuses would not occur. 468 F. 2d 192. The court went on to say: "The citizen's right to be left alone demands that the spirit require strict compliance with the letter of this legislative proviso." 468 F. 2d 193.

In holding that the evidence should have been suppressed, the court concluded that notwithstanding the burdens imposed on the attorney general to give such matters his individual attention,

"* * * Congress could justifiably feel it important that the public know that only an identifiable person subject to the political process could trigger the unknown, unseen, unheard intrusion into private affairs that are constitutionally protected against unreasonable searches, entitled to freedom from self-incriminatory results, and presumptively innocent." 468 F. 2d 193.

Two Federal district courts in Pennsylvania reached the same conclusion in opinions filed shortly thereafter. United States v. Cihal, 336 F. Supp. 261 (W. D. Pa. 1972); and United States v. Baldassari, 338 F. Supp. 904 (M. D. Pa. 1972).

The reasons for refusing to hold that § 510 governs over § 2516 were more fully developed in United States v. Aquino, 338 F. Supp. 1080 (E. D. Mich. 1972). There, the court held that where one statute contains a specific provision, as does § 2516, and the other a more general provision, as in § 510, the particular or specific controls, adding: "[A] legislative affirmative description implies denial of the non-described powers." 338 F. Supp. 1083. Accordingly, the court held that only the attorney general or an assistant attorney general specially designated by the attorney general could authorize wiretap applications. "Far more than mere noncompliance with a statutory 'technicality'

is here involved; a principal Congressional purpose has been thwarted and the Court cannot and will not condone such procedure." 338 F. Supp. 1084.

United States v. Focarile, 340 F. Supp. 1033, 1051 (D. Md. 1972), stresses 18 USCA, § 2518(4)(d). That section requires that each order authorizing a wiretap shall specify the identity "of the person authorizing the application." The court was of the opinion that the word "person" meant "a specific, identifiable, individual human being." 340 F. Supp. 1056. The corresponding provision in the Minnesota statutes is found in 626A.06, subd. 4(d).

The case against the "alter ego" concept was well articulated in United States v. Narducci, 341 F. Supp. 1107, 1114 (E. D. Pa. 1972). There the government conceded that neither the attorney general nor his assistant attorney general in charge of the Criminal Division of the Department of Justice was aware of the wiretap application involved. Again, it was urged that it was impossible for the attorney general personally to exercise all his statutory functions and that he was obliged to delegate authority as provided by § 510. In rejecting this argument, the court noted that Congress in dealing with authority to initiate wiretaps made it clear that "it deemed *implementation* of that awesome power to be a matter of high national policy." To accept the government's position, the court felt, would dilute the standard of responsibility created by Congress and encourage a laxity which might lead to excesses or abuses seriously affecting personal liberties.

The Narducci court disposed of the government's objection against invoking the "drastic remedy" of suppression of evidence by pointing out that the exclusionary rule was mandated by Congress as a further safeguard to provide teeth for the Fourth Amendment. 341 F. Supp. 1116. Although in United States v. Fox, 349 F. Supp. 1258, 1262 (S. D. Ill. 1972), the government attempted to validate a wiretap which had not been authorized by either the attorney general or an assistant attorney general,

arguing that the attorney general assumed full responsibility after the fact, the court there stated that the statute condoned no such procedure.

"When matters of a person's privacy are involved, the Government should be required to adhere to the dictates of Congress. The citizen's right to be left alone demands strict compliance with the letter of this legislative proviso."

A similar view was expressed in United States v. Brown, 351 F. Supp. 38, 41 (W. D. N. C. 1972), where the court held that the purposes of the statute were frustrated by standard procedures which "in flagrant violation of the statute" incorrectly identified in the applications the individuals who authorized them. The court found such representations "routinely false. * * * Wiretapping, of dubious constitutionality at best, should be sanctioned if at all only under the strictest view of the strict procedures laid down by a careful Congress."

Finally, two important decisions deserve comment, one written by Chief Judge Friendly of the Second Circuit Court of Appeals, United States v. Pisacano, 459 F. 2d 259 (1972), and the other written by Senior Circuit Judge Sobeloff of the Fourth Circuit Court of Appeals, United States v. Giordano, 469 F. 2d 522 (1972). Certiorari was granted by the U. S. Supreme Court in the Giordano case on March 26, 1973. 411 U. S. 905, 93 S. Ct. 1530, 36 L. ed. 2d 194. In Pisacano the court was not obliged to resolve the authorization problem because the defendants had unequivocally admitted their guilt. The issue was whether it was an abuse of discretion to deny a motion to withdraw the pleas of guilty after defendants discovered the attorney general had not authorized one of the wiretaps on which evidence of their guilt was based. The court said (459 F. 2d 262):

"* * * Certainly there were here no equities in the usual sense in favor of these defendants, who, despite the substantial interval between their initial pleas of not guilty and the date set for their trial, pleaded guilty only after the court had reserved

time for trial and the Government had brought witnesses from considerable distances."

In discussing whether the pleas were based on the assumption that the wiretap evidence was admissible, the court found that the facts were unlike those in Robinson since at least two taps were personally authorized by the attorney general. As to one application, however, which had not in fact been initiated by the attorney general, the court simply took the position that the attorney general had assumed full responsibility for the application. This the court held satisfied the requirements of the unitary policy required by Congress. Had Congress wished to prohibit delegation of any sort, " it knew how to do it." 459 F. 2d 263. The Pisacano decision was followed in United States v. Becker, 461 F. 2d 230 (2 Cir. 1972); United States v. Mainello, 345 F. Supp. 863 (E. D. N. Y. 1972) ; and United States v. Ceraso, 467 F. 2d 647 (3 Cir. 1972).

What is to us the more persuasive view was well articulated by Judge Sobeloff in the Giordano case. That opinion characterizes the failure of either Attorney General Mitchell or his assistant in charge of the criminal division, Will Wilson, to sign the letters which bore their initials and signatures as the "Alice in Wonderland" world of Justice Department wiretap applications. The court underscored the intent expressed by Congress that the formulation of policy in the use of electronic surveillance techniques be centralized in a publicly responsible official who is subject to the political process. (The political process to which Congress alluded meant the confirmation by the Senate of the attorney general and his nine assistants.) This centralization, Congress said, would avoid developing divergent practices and, in the event of abuses, the lines of responsibility would lead to an identifiable *person*. With respect to the argument that the statute was satisfied by the attorney general's assuming responsibility after the fact, the court observed that it would permit the attorney general with the benefit of hindsight to say that a "subordinate had betrayed his confidence, acted beyond the scope

of his responsibility, and the actions taken were not those of an agent. The alter ego theory destroys the concept of establishing identifiable individual responsibility at a certain level of government." 469 F. 2d 528. Although the attorney general could have chosen an assistant attorney general to serve as his alter ego, "he could not annoint his executive assistant to serve as his alter ego." 469 F. 2d 529.

The court in Giordano addressed itself to the government's contention that the drastic remedy of suppression should not be used to correct a "technical defect in procedure." 469 F. 2d 531. This, the court said, was a "beautiful example of the bootstrap technique." Id. In the court's opinion, the defects went to the very heart of the statute. In affirming the district court order which suppressed the fruit of the wiretaps, the court recalled the famous admonition of Mr. Justice Brandeis that when the government becomes a lawbreaker, it breeds contempt for law. Olmstead v. United States, 277 U. S. 438, 485, 48 S. Ct. 564, 575, 72 L. ed. 944, 960 (1928).[5]

Senate Report 1097, to which reference has been made, expresses well the concerns which have assailed this court and other courts at all levels in enforcing the dictates of the Fourth Amendment against threatened erosion by the use of wiretaps.

"The tremendous scientific and technological developments that have taken place in the last century have made possible today the widespread use and abuse of electronic surveillance techniques. As a result of these developments, privacy of communication is seriously jeopardized by these techniques of surveillance. Commercial and employer-labor espionage is becoming widespread. It is becoming increasingly difficult to conduct business meetings in private. Trade secrets are betrayed. Labor

---

[5] See, also, United States v. Lanza, 341 F. Supp. 405 (M. D. Fla. 1972); United States v. Boone, 348 F. Supp. 168 (E. D. Va. 1972); United States v. Vasquez, 348 F. Supp. 532 (C. D. Cal. 1972); and United States v. Askins, 351 F. Supp. 408 (D. Md. 1972).

and management plans are revealed. No longer is it possible, in short, for each man to retreat into his home and be left alone. Every spoken word relating to each man's personal, marital, religious, political, or commercial concerns can be intercepted by an unseen auditor and turned against the speaker to the auditor's advantage." 1968 U. S. Code Cong. & Adm. News, p. 2154.

The conclusion we reach is supported by A. B. A. Standards Relating to Electronic Surveillance, § 5.1 (Approved Draft, 1971). That standard provides:

"The use of electronic surveillance techniques by law enforcement officers for the overhearing or recording of wire or oral communications uttered in private without the consent of the parties should be permitted upon a judicial order of the highest court of general trial jurisdiction based on a suitable application authorized by the appropriate prosecuting officer."

In the comments accompanying the standards, it is stated (Id. pp. 132, 133) : "* * * [O]bviously the only appropriate prosecuting officers will be county prosecutors. * * * Only by making the prosecutor himself responsible can the political process be effectively brought into play."

We need not recapitulate the arguments which have been exhaustively advanced in the opinions to which we have referred. The St. Louis County Attorney took no part in applying for the wiretapping of defendants' telephone and was wholly unaware of the fact the application was being made. It is he, and not the assistant county attorney, who is politically responsible to his constituents. The Minnesota statute specifying that "a county attorney of any county may make application," Minn. St. 626A.05, subd. 1, was adopted after § 388.10 was enacted. We share the views expressed by the Federal courts that in an area as sensitive as the invasion of privacy of oral communications, there is no room to expand our statute beyond what Congress and the legislature expressly authorized. As we noted at the outset, it is a criminal statute which punishes unauthorized use of

electronic surveillance. It is designed to give effect to the Fourth Amendment and not to erode it. If Congress had intended to permit an assistant county attorney to apply for an order authorizing an electronic surveillance, it had only to follow 18 USCA, § 2516(1), which expressly designates assistant attorneys general as qualified to exercise such authority.

We are satisfied from a reading of the state and Federal statutes and the numerous cases construing them that neither statute intends that at the county level anyone other than the "principal prosecuting attorney" (18 USCA, § 2516[2]) shall have the power to initiate an electronic surveillance. Accordingly, since the evidence obtained by the search of defendants' automobile was seized under a warrant based on information obtained in violation of c. 626A, the Minnesota Privacy of Communications Act, the statute requires that it be suppressed. The writ of prohibition is discharged and the matter remanded for appropriate proceedings consistent with the decision we here reach.

MR. JUSTICE TODD and MR. JUSTICE MACLAUGHLIN, not having been members of this court at the time of the argument and submission, took no part in the consideration or decision of this case.