Rockingham
No. 78-186

## THE STATE OF NEW HAMPSHIRE

v.

## NICHOLAS MOCCIA, C. SCOTT HEGGIE,
## SANDRA FOUCHER, AND HENRY FOUCHER

March 23, 1979

*Thomas D. Rath*, attorney general (*Richard B. McNamara*, assistant attorney general, orally), for the State.

*G. Page Brown*, of Exeter (*Jay J. Curley*, of Wakefield, Massachusetts, orally), for defendants Moccia and Heggie.

*Fisher & Randlett*, of Portsmouth (*Arthur C. Randlett*, by brief), for the defendants Foucher.

DOUGLAS, J.    The defendants Nicholas Moccia and C. Scott Heggie were indicted for unlawful possession of marijuana in excess of one pound. RSA 318-B:26 I(c) (Supp. 1977). After an evidentiary hearing, the defendants' motion to suppress evidence obtained from a wiretap and marijuana seized pursuant to a search warrant was denied. Trial by jury resulted in a verdict of guilty. The defendants excepted to the denial of the motion to suppress and their exceptions were transferred by *Loughlin*, C.J.

On February 13, 1977, Justice Perkins issued a ten-day interception order which authorized the State police to intercept wire communications over a designated telephone "connected to a residence located on North Road, Sandown, New Hampshire" and "occupied by Nicholas Moccia, Denise L. Finn, C. Scott Heggie and other unknown persons." After the ten-day intercept, an extension order for an additional ten days was granted. The original order stated that "the period of time during which said interception is authorized is for ten days and the interception shall not automatically terminate when the described communications have been first obtained." Also included in the order was a provision that the "authorization shall be executed as soon as practicable," "shall be continuous daily, 24 hours a day, and in any event for no longer than ten days," and "shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception."

The defendants contend that the intercepted evidence must be suppressed because the order violated RSA 570-A:9 V. RSA 570-A:9 V, which describes the requirements for interception orders, provides that:

> [n]o order entered under this section may authorize or approve the interception of any wire or oral communication for any period longer than ten days . . . . Every order and

extension thereof shall contain a provision that the authorization to intercept shall be executed as soon as practicable, shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter, and must terminate upon attainment of the authorized objective, or in any event in ten days.

These provisions are identical to the parallel provisions of the federal wiretap statute except that the maximum duration for a federal wiretap authorization is thirty days instead of ten days. 18 U.S.C. 2518(5) (1970). Although the order included a statement that the "authorization shall be executed . . . in any event for no longer than ten days," it did not include a statement that the authorization "must terminate upon attainment of the authorized objective."

■ Other jurisdictions have held that the identical section of the federal statute, 18 U.S.C. 2518(5) (1970), requires the inclusion of all of the provisions of that section in the authorization order. *State v. Siegel*, 13 Md. App. 444, 285 A.2d 671 (1971); *Johnson v. State*, 226 Ga. 805, 177 S.E.2d 699 (1970). The fact that wiretapping poses a greater risk to one's privacy than a conventional search underscores the importance of strict compliance with these procedural safeguards. We therefore hold that RSA 570-A:9 V requires the inclusion of all of its provisions in the authorization order.

■ In the present case, however, the order's failure to specify that interception must terminate when the objective has been achieved did not prejudice the defendants and is harmless beyond a reasonable doubt. The interception did terminate "upon attainment of the authorized objective" even though the ten-day period of authorization had not been exhausted. The State police ceased surveillance after the first day of the ten-day extension order.

Defendants next argue that the wiretaps must be suppressed because the State failed to comply with the statutory command, which was also embodied in the court's order, "to minimize interception of communications not otherwise subject to interception." RSA 570-A:9 V. It is undisputed that, except for two conversations, the State police monitored *all* incoming and outgoing calls on the defendants' phones 24 hours a day for eleven days. Although 765 calls were intercepted, only 237 were found to be pertinent, and only six were used at trial. One call to a Massachusetts attorney was intercepted as well as calls to a veterinarian, a plumber, and an oil company.

■ The Supreme Court of the United States recently held that interception of all calls for a period of thirty days under judicial authorization does not violate an order, the federal statute, or the fourth amendment, even when a high percentage of the monitored conversations were nonincriminating. *Scott v. United States*, 436 U.S. 128 (1978). This decision defined the minimization standard as reasonableness under the facts and circumstances of each case. Thus the percentage of nonpertinent calls intercepted is only one factor in determining whether the police minimized unnecessary intrusions. *Scott v. United States*, 436 U.S. at 140.

■ A second factor is the nature and scope of the criminal activity under investigation:

> [l]arge and sophisticated narcotics conspiracies may justify considerably more interception than would a single criminal episode. This is especially so where, as here, the judicially approved purpose of the wiretap is not so much to incriminate the known person whose phone is tapped as to learn the identity of the far-flung conspirators and to delineate the contours of the conspiracy.

*U.S. v. Quintana*, 508 F.2d 867, 874 (7th Cir. 1975). A third important consideration is the State's reasonable expectation of the contents of particular calls. In a drug conspiracy, until a pattern of innocent calls develops, it may be necessary to intercept all calls in order to find out the extent of the conspiracy, the identity of sellers and potential purchasers, and methods of distribution. Once a category of innocent calls develops, those monitoring have a duty to shut down. *Scott v. United States*, 436 U.S. at 142. Here, however, eleven days was too brief a period for such a pattern to develop. Finally, the duration of the tap may also affect the extent of minimization required. *United States v. Chavez*, 533 F.2d 491 (9th Cir. 1976), *cert. denied*, 426 U.S. 911 (1976).

In the present case, the purpose of the wiretap was to investigate a large scale drug conspiracy. The police had difficulty identifying what conversations were relevant because of the large number of people involved and the uncertainty of their identity. This difficulty was increased by their use of guarded language and code words, a common practice of those dealing in illicit drugs. Even the apparently legitimate business and professional calls could not be placed above suspicion. Many calls were ambiguous in nature. Others were very short, such as wrong number calls, calls to directory assistance, or one-time conversations. Some of the longer calls included innocent

conversations with children but were interspersed with conversations between adults. Characterization of these calls was virtually impossible until their completion.

■ Although in retrospect this court can point to many nonincriminating calls, this is not the proper test for minimization. *Scott v. United States*, 436 U.S. at 138. We conclude that the interception of virtually every call during the comparatively brief period of the tap did not violate the minimization requirement.

[6, 7] The defendants finally contend that the 740 pounds of marijuana seized from the "red barn" should be suppressed because the affidavit underlying the search warrant was insufficient to establish probable cause. The application for the search warrant requested authority to search:

> [t]he Finn Realty and Trust Property located on North Road, Sandown, New Hampshire, described as a two-and a one-half story wood-framed dwelling painted white with blue trim with attached ell and barn and *adjacent barn, color red behind the cemetery* which is west of the above described dwelling.

The search warrant contained the same general description of the premises to be searched. The affidavit, however, identified the property to be searched as the "Finn residence" described as being on North Road in Sandown, New Hampshire. No mention was made of the adjacent barn. From their research at the registry of deeds, the police believed that the "red barn" was part of the "Finn residence." After the search, the police learned that although title to the house and attached barn was held by Finn Realty Trust, the "red barn" was owned by Kelley Realty Trust. An error in description is not automatically fatal to the validity of a search warant. *U.S. v. Prout*, 526 F.2d 380 (5th Cir. 1976), *reh. den.* 529 F.2d 999, *cert. denied*, 429 U.S. 840 (1976). The United States Supreme Court has also stated that technical attacks upon affidavits and warrants are not to be encouraged.

> Affidavits for search warrants such as the one involved here must be tested and interpreted by magistrates and courts in a commonsense and realistic fashion. They are normally drafted by nonlawyers in the midst and haste of a criminal investigation.

*U.S. v. Ventresca*, 380 U.S. 102, 108 (1965). It is evident that the search of the "red barn" was contemplated because the application for the

warrant and the search warrant itself made reference to a "red barn." Moreover, except for the obvious error in the statement of ownership of the barn, the affidavit was sufficient to establish probable cause. *See Zurcher v. Stanford Daily*, 436 U.S. 547 (1978). The affidavit includes excerpts from intercepted calls which "revealed that quantities of cannabis-type drugs from ounces to multi-pound lots are being kept and sold from the Finn residence." On these facts, we are satisfied that the error was not fatal to the validity of the search warrant.

*Exceptions overruled.*

All concurred.