STATE of Minnesota,
Petitioner, Appellant,

v.

Mara Therese QUINN, et al.,
Respondents.

No. C7–88–14.

Supreme Court of Minnesota.

Jan. 31, 1989.

Rehearing Denied March 6, 1989.

Thomas L. Johnson, Vernon E. Bergstrom, Toni A. Beitz, Hennepin County Atty., Minneapolis, for appellant.

Michael McGlennen, A. Demetruis Clemons, Craig Cascarano, M.G. Singer, Minneapolis, for respondents.

KELLEY, Justice.

As the result of a court order authorizing a wiretap, police intercepted conversations and later seized certain evidence implicating respondents in various types of criminal activity. The respondents moved to suppress the evidence contending that the warrant authorizing the wiretap on its face was fatally defective for failure to include a statutory phrase that the warrant "must terminate upon attainment of the authorized objective." Minn.Stat. § 626A.06, subd. 4(h). By a split decision, a court of appeals panel affirmed a trial court order suppressing the evidence for that failure to comply literally with the statute. *State v. Quinn*, 422 N.W.2d 763 (Minn.App.1988). We granted the state's petition for further review. We conclude that the constitutional safeguard to the citizens' privacy rights was fully protected by substantial compliance with the statute's mandate. Therefore, we reverse.

The Minneapolis Police Department in the spring of 1985 commenced an investiga-

tion of a suspected shoplifting ring and fencing operation. An informant had provided police with information that a widespread "boost and return" fencing operation was being operated by Mara Quinn and Jerald Saliterman. During the course of a search of the Quinn residence made pursuant to a duly issued search warrant, officers observed empty clothes racks and other items and paraphernalia useful to and often employed in that type of a criminal enterprise. Police likewise questioned persons who admitted to having purchased merchandise at the Quinn residence for less than the normal retail price. Neighbors complained of the heavy traffic in and out of the Quinn residence. During the course of continuing surveillance operations later that fall, officers observed a number of people coming from the Quinn residence carrying what appeared to be bags full of merchandise. They also noted that although neither Quinn nor Saliterman appeared to be employed, they frequently brought bags of merchandise into the residence. Intermittently during the surveillance period several sources had provided the officers with information indicating that the suspected criminal activity was ongoing. Those informants also apprised the police that Saliterman and Quinn had associates working at stores, especially Dayton's, who assisted them in stealing. Police learned that customers "placed" orders with Quinn and Saliterman for stolen merchandise by telephone. As the result of a pen register on the telephone at the Quinn residence, police learned that large numbers of telephone calls were made to and from the residence. Saliterman had a criminal record. A number of the calls placed from the residence were to other convicted felons. A police initiated undercover operation proved to be unsuccessful when the targets recognized the undercover officer, but a police informant was able to purchase from Quinn property which

was believed by authorities to have been stolen from Dayton's.

A well planned and successful burglary of Cedrics, an Edina retail store, occurred on October 6, 1985. Fifty-four fur coats valued at $354,770 were stolen. Eye witness evidence from a juvenile at the scene implicated Saliterman as well as three other persons, whom the pen register had identified as recipients of phone calls placed from the Quinn residence.

The police investigation of the suspected Quinn–Saliterman enterprise continued over a number of months. Some of the information furnished police by informants had been confirmed to the extent that the police had probable cause to believe that Quinn and Saliterman, and, perhaps others, were involved in a somewhat sophisticated, extensive, and high dollar volume criminal operation. However, those tips and follow-up investigative efforts had failed to produce sufficient evidence to convict either person, or any other person, of any crime which would be commensurate with the extent of their involvement in a scheme of this magnitude.

Separate from, and initially unrelated to, the on-going Minneapolis police investigation, Hennepin County deputy sheriff Walt Power independently learned from an informant that Norman Mastrian was selling stolen fur coats. Power arranged through the informant to be introduced to Mastrian in an undercover capacity. Pretending to be interested in purchasing fur coats Power engaged in purchase negotiations during which Mastrian admitted the coats he was selling were those stolen in the Cedrics burglary. Eventually the negotiations led to the purchase by Power of two of the coats in January 1986.[1] During those negotiations, Mastrian had informed Power that he had access to 30 other coats, while nonetheless always insisting he was acting only as a middleman. A pen register placed on the phone at Mastrian's resi-

---

1. The state concedes that after the purchase, it had sufficient evidence to support charges against Mastrian for the sales. However, the state asserts the real focus of its investigation over the many months was to secure evidence establishing the Quinn, Saliterman, Mastrian connection sufficient to prosecute both Quinn and Saliterman, break up the shoplifting ring and fencing operation, and recover the coats stolen from Cedrics and the merchandise stolen from other persons.

dence, as well as the pen register on the Quinn telephone, confirmed a connection between Mastrian and Quinn–Saliterman by a number of telephone communications passing back and forth between the two residences.

The failure of normal traditional investigative techniques to produce sufficient evidence to convict the members of the gang of crimes, which the police by now were certain were being committed by persons involved in an operation run from the house at 1012 Thomas Avenue South, Minneapolis, the customary residence of suspects Mara Quinn, Gerald Saliterman, Edward Quinn and Greg Scholl, prompted the police, by necessity, to seek authority to place a wiretap on the house's telephone. An assistant Hennepin County attorney, with their aid, drafted the application, supporting affidavits, and a proposed warrant to be signed by a magistrate authorizing the wiretap. Those documents were then reviewed by the assistant county attorney's immediate superior, and later by the county attorney himself before they were presented to District Judge Patrick Fitzgerald on February 10, 1986. Judge Fitzgerald, after reviewing the documents, signed the warrant authorizing a wiretap surveillance. The warrant provided that its authority would automatically terminate either in ten days or when a suspect was charged. As provided by Minn.Stat. § 626A.06, subd. 4(e) (1986), the warrant further provided that the authorization should not "automatically terminate when the described communication has been first obtained." The warrant did contain the minimization clause required by Minn.Stat. § 626A.06, subd. 4(h). The warrant did not state that the wiretap authorization would terminate upon attainment of the authorized objective. *See* Minn.Stat. § 626A.06, subds. 4(h), 5. This omission was the result nei-

ther of an intentional act nor secretarial error in the county attorney's office.

Officers conducting the wiretap had been trained in, and followed, procedures to minimize interception of conversations overheard. The conversations actually monitored were between persons who appeared to be purchasers of stolen goods, those involved in the "boost and return" operation, store personnel seemingly involved with the scheme, and with individuals who appeared to be involved with shoplifting. Of 565 telephone calls monitored, 231, or 41 percent related to criminal activity connected with the scheme.

Simultaneously with the wiretap, Deputy Sheriff Power's undercover negotiations with Norman Mastrian continued. Those negotiations ultimately resulted in an agreement by Mastrian to exchange 14 additional stolen coats for cocaine. Wiretap interceptions on the Quinn–Saliterman telephone also revealed that the person forming the connecting link between them and Mastrian was Terry Martin. On February 18, 1986, when Mastrian and Martin attempted to deliver 14 fur coats to Power, they were immediately arrested.[2]

Though neither mandated by law nor the warrant itself, the assistant county attorney prepared and furnished a report, based upon logs of monitored conversations emanating to and from the Quinn–Saliterman residence. By statute and the warrant's specific terms, the wiretap authority ended at 11:42 a.m. on February 20. Approximately 20 minutes later a complaint charging Mastrian and Martin with possession of 14 stolen fur coats was filed.[3]

The investigation into the activities of the ring continued beyond the termination of the wiretap. As a result of the interceptions, stolen property was recovered, identified and inventoried and police were able to locate and interview witnesses including owners of some of the stolen property.[4]

---

**2.** The following day a representative from Cedrics identified 13 of the 14 coats as being coats stolen in the burglary. The 13 coats had a retail value of $166,000.

**3.** Mastrian and Martin made their first appearance before the court, and the charges were filed against them within the 36 hour deadline

as provided by Rule 4.02, subd. 5(1) and (2), Minn.R. of Crim.Pro.

**4.** Property recovered and identified included rings stolen in a Donald Anderson burglary, furs stolen from Dayton's, furs stolen in a burglary at Gucci's, and clothing stolen from retail stores in Minneapolis, Phoenix, Arizona, and

On May 15, 1987 complaints alleging a number of counts of receiving stolen property were filed against Quinn, Saliterman and five others.

Because the discovered activities of Quinn and Saliterman may have likewise violated federal criminal statutes, Minneapolis and Hennepin County law enforcement agencies relayed the information uncovered during the investigation to local federal authorities. In May and August 1987, federal grand jury indictments were returned and filed charging Quinn, Saliterman, and others with various federal criminal offenses.

Pre-trial motions to suppress the evidence from the wiretap were made in both the federal and the state court.[5] The hearing on the suppression motion pending in state court was deferred pending the outcome of the hearing on the identical motion in federal court. United States Magistrate Janice Symchych initially heard the motion. She recommended to the United States District Court that all four challenges to the warrant be denied. Specifically she recommended denial of the challenge to the wiretap warrant notwithstanding that it omitted the statutorily mandated phrase that the warrant " * * * must terminate upon attainment of the authorized objective * * * Minn.Stat. § 626A.06, subd. 4(h) (1986)." In doing so, she stated: "The absence of the authorized objectives language is not fatal here. Because the order clearly called for termination within 10 days, or earlier, if one of the named parties is charged, it is more narrowly confined in particular than in each of the warrants upheld in the foregoing cases." *United States v. Saliterman,* CR 6–87–101, slip. op. at 19–20 (D.Minn., Nov. 23, 1987). United States District Judge Devitt

adopted that recommendation. Because the warrant substantially complied with federal statutes, Judge Devitt held the omission of the statutory provision from the body of the warrant did not render the warrant facially defective. *United States v. Saliterman,* CR 6–87–101, slip. op. at 2 (D.Minn., Dec. 7, 1987).

The identical suppression issues were later presented to Hennepin County District Judge Charles Porter. He adopted the transcript of the federal hearing as the record of the facts of the case, and, as well, adopted Magistrate Symchych's recommendation with one exception. Judge Porter held that under Minnesota Statutes, and cases interpreting them, the failure to include the termination provision mandating cessation of the tap upon attainment of the authorized objective in the warrant itself rendered the wiretap warrant facially invalid, and, consequently, that the conversations intercepted and derivative evidence seized as the result of the wiretap must be suppressed. His ruling, affirmed by a split court of appeals panel, resulted from a strict and literal application of the statutory language.[6]

■ To resolve the issue raised by this appeal, we must interpret portions of Minnesota Statute, chapter 626A, the Privacy of Communications Act. Specifically, we must focus on four statutory provisions: (1) Minn.Stat. § 626A.06, subd. 5, circumscribing the duration of a wiretap intercept; (2) Minn.Stat. § 626A.06, subd. 1(d) which authorizes an applicant, upon making an appropriate showing, to intercept multiple conversations; and (3)–(4) Minn.Stat. § 626A.06, subd. 4(e) and (h) which specify information to be included in the warrant. Those four statutory provisions are representative of attempts initial-

Winona, Minnesota. In addition to the value of the furs stolen from Cedrics, the retail value of the recovered property was $60,000. On May 15, 1987, criminal charges of receiving and concealing stolen property and conspiracy were filed not only against Mara Quinn, Jerry Saliterman, but also against Freida Opitz, Dawn Pinkerton, and Orville Thurman, whom the wiretap had revealed to be involved in the scheme.

5. Motions in both courts challenged the wiretap warrant on four grounds: (1) Lack of probable cause, (2) insufficient minimization procedures, (3) lack of particularity, and (4) lack of termination provision.

6. Both state courts relied primarily upon *State v. Frink,* 296 Minn. 57, 206 N.W.2d 664 (1973): neither court acknowledged or cited our later case, *State v. Monsrud,* 337 N.W.2d 652 (Minn. 1983).

ly made by the Congress and later by the several state legislatures to codify the holdings of three United States Supreme Court cases which, while holding that under certain circumstances police wiretap interceptions would not violate the United States Constitution's Fourth Amendment proscription barring unreasonable searches and seizures, nevertheless established standards designed to minimize intrusions upon the citizens' privacy rights.

In *Osborn v. United States*, 385 U.S. 323, 87 S.Ct. 429, 17 L.Ed.2d 394 (1966) the United States Supreme Court denied a challenge on Fourth Amendment grounds to a warrant authorizing a concealed tape recording of a conversation between the accused and an informant. After noting that the officers had prepared and submitted a report to two federal judges who approved the procedure, the court stated: "There could hardly be a clearer example of the procedure of antecedent justification before a magistrate that is central to the Fourth Amendment as a precondition of lawful electronic surveillance." *Id.* at 330, 87 S.Ct. at 433. The same court, in the subsequent case of *Berger v. New York*, 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967), invalidated on Fourth Amendment grounds a New York statute which (1) permitted a tap without any prior showing of probable cause that any offense had been or was being conducted; (2) authorized the tap to continue for as long as two months upon a simple showing of probable cause, with an additional two months extension if,

in the public interest, and (3) failed to provide for automatic termination once the conversation sought had been seized. In *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) the court held an intercept of a conversation by this type of eavesdropping violated the Fourth Amendment prohibition on unreasonable searches, unless an impartial judicial officer has first determined the need for the interception and then structured the procedure to be employed to insure a narrow intrusion into privacy no broader than necessary for the police to attain their legitimate objective.

The Congress reacted to this triad of cases in 1968 when, as part of the Crime Control and Safe Street Act, 18 U.S.C. §§ 2510–20 (1982), it codified the holdings of those cases. One provision of the act requires that a wiretap " * * * must terminate upon attainment of the authorized objective * * * " 18 U.S.C.A. § 2518(5) (Supp. 1988).[7]

Thereafter, several states followed suit by enacting legislation patterned after the federal act. Minnesota passed an act authorizing wiretaps which has been codified and now forms part of the Privacy of Communication Act, Minn.Stat. §§ 626A.01–.23 (1986). The Minnesota act contains a termination provision identical to that appearing in the federal statute.[8] As does the wording of the federal statute, the literal wording of the Minnesota statute requires that the warrant itself provide for automat-

7. Specifically the statute reads:
No order entered under this section may authorize or approve the interception of any wire, oral or electronic communication for any period longer than *is necessary to achieve the objective of the authorization,* nor in any event longer than thirty days. * * * Every order and extension thereof shall contain a provision that the authorization to intercept shall be executed as soon as practicable, shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter, *and must terminate upon attainment of the authorized objective, or in any event in thirty days.*
18 U.S.C.A. § 2518(5) (Supp.1988) (Emphasis supplied).

8. Material provisions of the act are:

The warrant shall contain the grounds for its issuance with findings as to the existence of the matters contained in subdivision 1 and shall also specify: * * *
(e) *the period of time during which such interception is authorized,* * * *
(h) * * * *and must terminate upon attainment of the authorized objective,* or in any event in ten days * * *
**Subd. 5. Duration of warrant.** No warrant entered under this section may authorize or approve the interception of any wire, electronic, or oral communication for any period longer than is *necessary to achieve the objective of the authorization,* nor in any event longer than ten days.
Minn.Stat. § 626A.06, subds. 4, 5 (1988). (Emphasis supplied).

ic termination upon attainment of the achieved objective. Notwithstanding the literal wording, the state urges us to follow the lead employed by federal courts, as well as a number of state jurisdictions, in determining whether wiretap warrants meet the requirements of the Fourth Amendment. Federal courts have generally upheld the validity of a wiretap interception provided: (1) that the warrant has substantially, if not literally, complied with the applicable statute, (2) that the statute's underlying purpose to minimize the extent of the governmental intrusion has not been frustrated by the omission, (3) that the omission involved a noncrucial statutory requirement, and (4) that the accused was not prejudiced. That approach appears to be merely an extension of the approach federal courts have traditionally used in testing application affidavits and traditional search warrants to see if they measure up to constitutional Fourth Amendment requirements; that is, to test such documents in a "common sense and realistic fashion" and not in a hyper-technical manner. *See, e.g. United States v. Ventresca,* 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965). Thus, in *United States v. Tortorello,* 480 F.2d 764 (2nd Cir.) *cert. denied,* 414 U.S. 866, 94 S.Ct. 63, 38 L.Ed.2d 86 (1973) the issue involved both the validity of New York's wiretap statute as well as whether the intercept warrant was itself constitutionally defective. After holding that New York's law, which, as does the Minnesota statute, virtually tracks the language of Title III of the omnibus Crime, Control and Safe Streets Act of 1968, to be constitutional, the court addressed the defendant's challenge that the application for, and the wiretap warrant itself lacked sufficient particularity as to enumerate the offenses being charged. After observing that "[p]articularity in an eavesdrop or wiretap

application and order is critical to the constitutionality of a surveillance", *id.* at 779, the court analyzed *United States v. Scott,* 331 F.Supp. 233 (D.D.C.1971) and *United States v. Mainello,* 345 F.Supp. 863 (E.D. N.Y.1972). It concluded the holdings in both of those cases as well as those in *United States v. Escandar,* 319 F.Supp. 295 (S.D.Fla.1970), *United States v. Leta,* 332 F.Supp. 1357 (M.D.Pa.1971), and *United States v. King,* 335 F.Supp. 523 (S.D. Cal.1971) demonstrated that federal courts have taken a pragmatic approach with respect to the particularity requirement. *Tortorello,* 480 F.2d at 780. Finally, even though the *Tortorello* court acknowledged that the applications before it were "somewhat broad," it held they nonetheless described the suspected offenses with a degree of particularity sufficient to meet the Fourth Amendment standards and the statutory requirement. *Id.* at 781. So, too, in *United States v. Baynes,* 400 F.Supp. 285 (E.D.Pa.1975) where the minimization and execute as soon as possible phrases were omitted, the court applied similar reasoning.[9] More on point to the issue in the present case are federal cases in which courts have sustained orders and warrants against Fourth Amendment challenges when the termination provision, as here, has been omitted. Those courts, though generally noting that "termination upon attainment of an objective" provision is mandatory, have read the missing statutory provision into the order and warrant. *See, e.g., United States v. Cafero,* 473 F.2d 489, 496 (3rd Cir.1973), *cert. denied,* 417 U.S. 918, 94 S.Ct. 2622, 41 L.Ed.2d 223 (1974); *United States v. Cohen,* 530 F.2d 43, 46 (5th Cir.) *cert. denied,* 429 U.S. 855, 97 S.Ct. 149, 50 L.Ed.2d 130 (1976); *United States v. Carubia,* 377 F.Supp. 1099, 1107 (E.D.N.Y.1974).[10]

**9.** The court stated:

In sum, we believe that, under the circumstances of this case, common sense requires us to hold that an inadvertent omission of the relevant language from the order does not constitute a fatal defect where the statute provides calipers for measurement of the impact of the prejudice to the defendants by reason of the omission, where the statute was, in fact,

substantially complied with and there was no prejudice to the defendants, and where only the "less crucial" requirements of the statute were actually breached.

*Id.* at 310.

**10.** The *Cohen* court sustained the intercept order even though it, as did the order in the present case, did not contain the exact statutory language:

The conclusion we draw from the federal cases is that federal courts would read the statutory termination phrase " * * * necessary to achieve the objective of the authorization * * * " into the order and then examine the actions of the police officers to see if, in fact, the wiretap ended when the objective was achieved.

The courts of several of the states, which after 1968, enacted statutes patterned after the federal Crime, Control and Safe Streets Act, have likewise had occasion to address the specific issue before us. A number of jurisdictions, in passing upon challenges to warrants permitting wiretap interceptions, have used an analysis similar to that employed by the federal courts. In *State v. Moccia*, 119 N.H. 169, 400 A.2d 44 (1979), even though the wiretap authorization had failed to specify that the interception must terminate when the objective was obtained, the warrant was upheld because the omission did not prejudice the defendants and was harmless beyond a reasonable doubt. Likewise, in New York, the omission of the termination provision was deemed a *de minimis* scrivener's error not justifying suppression when no prejudice was shown and the warrant was otherwise properly executed. *People v. Scarnati*, 133 Misc.2d 795, 508 N.Y.S.2d 365 (Cty.Ct.1986). Nebraska adopted the reasoning of *United States v. Cafero*, 473 F.2d 489 (3rd Cir. 1973) and accordingly read into the warrant its statutory requirement that the interception must end when the objective was achieved. *State v. Brennen*, 218 Neb. 454, 356 N.W.2d 861 (1984). Idaho, New Jersey, and Illinois have likewise generally applied the federal analysis. *See State v. Brown*, 113 Idaho 480, 745 P.2d 1101 (App. 1987) *cert. for rev. denied; State v. Christy*, 112 N.J.Super. 48, 270 A.2d 306 (Cty.Ct 1970); *People v. Wrestler*, 121 Ill. App.3d 147, 76 Ill.Dec. 548, 458 N.E.2d 1348 (1984).

On the other hand, in *State v. Maloof,* 114 R.I. 380, 333 A.2d 676 (1975), the Rhode Island court, in relying upon its own state constitution, rather than the Fourth Amendment, literally construed the statute and struck down a warrant which had omitted the termination provision.[11]

In several other cases where the court seemingly applied a strict or literal compliance analysis, the challenged order failed to include other required provisions. *See, e.g. Cross v. State*, 225 Ga. 760, 171 S.E.2d 507 (1969); *Johnson v. State*, 226 Ga. 805, 177 S.E.2d 699 (1970); *State v. Siegel*, 266 Md. 256, 292 A.2d 86 (1972); *State v. Pottle*, 296 Or. 274, 677 P.2d 1 (1984). The orders in *Cross, Johnson* and *Siegel* failed to include a statement whether the intercept would terminate when the described communication was first received, the minimization requirements, the termination provisions, and failed to name the individuals whose conversations could be intercepted. The Oregon court in *State v. Pottle* indicated it might view the matter differently if the order "omits no essential element and the shortcoming in the order had no consequence in the actual execution of the order." 677 P.2d at 10.

---

Third, the provision in the intercept order that said interception shall not automatically terminate * * *, but shall continue until communications are intercepted which reveal the details of the scheme which have been used to violate the (state laws), and the participants and nature of the conspiracy involved therein, or for a period of 30 days from the date of this order, whichever is earlier, fulfills the statutory requirement that an order be limited to the period necessary to achieve the objective of the authorization but in no event longer than 30 days.
*Cohen*, 530 F.2d at 46.

**11.** Conceivably, and, perhaps, even more significant to the result achieved was the fact that in addition to omitting the termination provision, the warrant in that case expressly provided that the interception did *not* terminate upon attainment of the authorized objective. That the latter inclusion weighed heavily in the court's conclusion is perhaps demonstrated when the court said the order "flies in the face of the express language of the statute in that it clearly states the intercept need not terminate upon the accomplishment of the order's purpose." *Id.* 333 A.2d, at 680. In Maryland, the state's statute expressly requires "strict compliance with this subtitle." In construing that statute, the Maryland court held that the·omission of the termination directive in the wiretap order rendered the instrument void *ab initio,* and, therefore, evidence obtained from the tap would be suppressed. *State v. Bailey*, 289 Md. 143, 422 A.2d 1021, 1028 (1980).

While this court has not before been called upon to address the specific issue raised by this case, on two previous occasions we have addressed two other provisions of the Privacy of Communications Act. As originally enacted, Minn.Stat. § 626A.05 required that the county attorney make the application for the intercept warrant. In *State v. Frink*, 296 Minn. 57, 206 N.W.2d 664 (1973) the assistant county attorney had applied for a wiretap. We held the warrant subsequently issued to be defective because the county attorney himself had not made application, and further held that the evidence obtained by the wiretap was inadmissible. *Id.* 206 N.W.2d at 665. We acknowledged the legislative intent underlying the inclusion in the statute of a provision limiting those who may apply for tap warrants to county attorneys reflected the public policy that such an intrusive authority should be restricted to a "publicly responsible official who is subject to the political process." *Id.* 206 N.W.2d at 674.[12]

Ten years later in *State v. Monsrud*, 337 N.W.2d 652 (Minn.1983) we applied a "pragmatic and commonsense approach" to the particularity requirement by utilizing the traditional Fourth Amendment analysis in upholding a trial court denial of a defendant's suppression motion. *Id.* at 658—59. In *Monsrud* the defendant additionally challenged the sufficiency of the warrant's minimization procedure. While we agreed that the warrant contained inadequate minimization provisions, we held that only conversations which had been improperly intercepted would be subject to suppression. *Id.* at 660–61.[13]

In this court respondent urges that we join the trial court and the court of appeals panel majority by holding the warrant facially defective for lack of literal compliance with the termination provision of Minn.Stat. § 626A.06, subd. 4(h)—the so-called strict compliance approach. The state, on the other hand, argues that the preferable approach is the employment of a "pragmatic and common sense" approach employed by United States District Court in its examination of this same warrant, the dissent in the court of appeals, and our prior analysis in *Monsrud*. Appellant finds support for its position in *Monsrud*: respondent emphasizes the efficacy of *Frink*. Each party implies that the case relied upon by the other erroneously employed an improper statutory construction standard. On first reading, *Frink* and *Monsrud*, indeed, may appear to announce contradictory rulings. However, further analysis demonstrates that their holdings are reconcilable. We construed Minn.Stat. § 626A.05(1) strictly in *Frink* because we perceived a legislative policy to provide one additional scrutiny and consideration by an official responsible directly to the electorate before the intrusive wiretap procedure was authorized. The statutory mandate there was clear and required no interpretation. The purpose underlying the statutory requirement could not be served by extending that authority to a non-elected subordinate. To the contrary, in *Monsrud*, the statutory directive was less certain. *Monsrud* involved Minn.Stat. § 626A.06, subd. 4(c) which requires that the warrant set forth "a particular description of the type of communication sought to be intercepted,

**12.** Notwithstanding our perception of the legislative intention underlying Minn.Stat. § 626A.05, subd. 1 in *State v. Frink*, we note, apparently in reaction to the holding in that case as well as its pragmatic effect upon the operation of modern prosecutors' offices, the class of persons now eligible to be applicants, though still limited, was expanded by ch. 253, § 1, 1976 Minn. Laws 937, 937.

**13.** Substantially the same policy concerns that underlie enactment of the Privacy of Communications Act, also are mirrored in the Minnesota Governmental Data Practices Act, Minn.Stat. ch. 13. In *State v. Smith*, 367 N.W.2d 497 (Minn. 1985), police learned of the defendant's address

from welfare authorities in violation of provisions of the act. They used the information in applying for a search warrant. We refused to suppress the evidence received as a result of the search. In doing so we applied the same traditional Fourth Amendment analysis that had been used in *Monsrud*. *Smith*, of course, is distinguishable because it did not arise under the Privacy of Communications Act, but it is relevant because it demonstrates that the privacy consideration is focused on whether the failure to technically follow the statute affected the basic protection the statute purported to afford. In that respect, it is consistent with *Monsrud*.

and a statement of the particular offense to which it relates." Obviously, a determination of whether a warrant complied with the particularity requirement calls for some judgmental analysis to rule whether the language employed in the warrant meets the standard. When that judgment analysis is necessary, *Monsrud* holds, the court should apply "a practical and common sense" reading of the documents in resolving the issue. *Monsrud,* 337 N.W.2d at 659. Had we construed the statute in *Frink* to permit an unauthorized assistant county attorney to be the applicant, it would have amounted to unwarranted judicial legislation, whereas, in *Monsrud* the primary legislative concern evidenced by the particularity requirement was to ensure that the wiretap warrant would be so limited as to avoid the evils of the general warrant. Thus, *Monsrud* held that a court was justified in focusing on substance rather than literal verbatim statutory compliance to determine whether the underlying policy was effectuated. However, in both cases the court's inquiry was concentrated on determining whether the particular application, warrant, and execution complied with, and met, the concerns addressed in *Osborn, Berger* and *Katz,* as codified in the statute.

The legislative concern that the duration of the warrant be limited only to time periods absolutely necessary to accomplish the result sought is evidenced by Minn.Stat. § 626.06, subd. 4(h) and subd. 5 which provide for termination upon attainment of the authorized objective, but in no event after a 10–day duration. Notwithstanding that Minn.Stat. § 626A.06, subd. 4(h) literally requires that the termination clause appear in the warrant, 626A.06, subd. 5 specifically directs that the authorization automatically expires when the objective has been reached or upon expiration of ten days, whichever occurs first. No warrant issued by a Minnesota court can (1) authorize a wiretap intercept for more than 10 days from issuance; (2) allow the surveillance to continue beyond the time necessary to achieve the authorized objective; or (3) permit continuation of monitoring after a named party has been charged. The authority to intercept conversation ends when the first of those three events occurs by statute regardless of what the warrant does or does not contain. The warrant in this case did not, and could not, extend the authorization beyond the statutory termination limits.

Before the magistrate signed this warrant he was aware of the magnitude and scope of the operation under investigation, the numbers and type of persons known to have some degree of involvement in it, and that it had been operative for an extended period of time in the past and was ongoing. He also had been informed that because of these facts a high probability existed that the entire 10–day statutory period would be necessary to obtain the authorized objective. Moreover, he knew the nature and scope of the investigation warranted inclusion of a provision, as permitted by Minn. Stat. § 626A.06, subd. 4(e), authorizing continuation beyond the time the first communication relative to the alleged conspiracy had been obtained. Under those circumstances, inclusion of the omitted language, insofar as advancing any legislative concern, would have been essentially redundant. To hold this warrant to be constitutionally defective in the light of these circumstances, because it omitted a redundant clause, appears to elevate literal formalism over realistic substance. The statute, Minn.Stat. § 626A.06, subd. 5, itself affords the necessary protection against pernicious intrusion upon constitutional privacy rights.[14]

---

**14.** The United States Third Circuit Court of Appeals in *United States v. Cafero,* 473 F.2d 489 (3d Cir.1973), *cert. denied,* 417 U.S. 918, 94 S.Ct. 2622, 41 L.Ed.2d 223 (1974) in testing the constitutionality of warrant and compliance with a substantially identical federal statute stated:

[W]e interpret section 2518(5) as requiring automatic termination upon attainment of the objective of the authorization *irrespective of* *whether a statement to this effect has been included by the authorizing judge.* Thus, the thirty-day period provided in the statute does not represent the statutory life of all authorizations not containing a statement requiring termination upon attainment of the objective. Instead, the thirty-day period is merely a statutory limitation on the life of any authorization, which terminates every authorization, at

■ Not every omission to technically comply with literal wiretap statutory requirements renders a wiretap "unlawful" within the meaning of Minn.Stat. § 626A.12(1), nor does every technical omission justify suppression of disclosure of contents of the intercepted communications or derivative evidence. *See, e.g., United States v. Chavez*, 416 U.S. 562, 579, 94 S.Ct. 1849, 1858, 40 L.Ed.2d 380 (1974). The deterrent of suppression is reserved to instances where the defect in the warrant impedes upon statutory requirements that "directly and substantially" implement the legislative intent that employment of wiretaps be limited to those situations clearly calling for the employment of rare and intrusive procedures. *See United States v. Giordano*, 416 U.S. 505, 527, 94 S.Ct. 1820, 1832, 40 L.Ed.2d 341 (1974).

The judge who granted the suppression motions concluded the warrant was facially defective because, in his opinion, the omission from the warrant of the termination on attainment of objective phrase "leaves the decision to terminate the intercept to the intercepting officers and the prosecuting authorities, and not to the sound and impartial discretion of the magistrate." We reject that conclusion because we find it faulty in at least three respects. First, we observe that even had the omitted language been in the warrant, the initial decision as to whether or when the tap had attained the achieved objective always rests with the police or prosecutors—it is only later that an impartial magistrate

judges whether that initial decision was correct. Secondly, neither the statute nor any rule of law requires the police or prosecutors to submit progress reports to the magistrate during the course of the tap unless directed to do so by the warrant. Finally, in this case, though not required by law or by the warrant itself, the prosecutor did furnish the issuing magistrate with a progress report on the 8th day of the tap.

The challenged warrant complies with statutory requirements in all respects except the omission herein discussed. That technical omission did not result in frustration of the statute's underlying purpose to minimize governmental intrusion into the lives of its citizens. The omission itself considered in the context of the circumstances surrounding the issuance of this warrant was not critical because the authority of no warrant may extend beyond the statutory limitations. Finally, there has been no showing of prejudice to these accuseds—there has been no showing that the intercept would not have occurred exactly as it did even had it contained the omitted language. For those reasons, we concur with the United States District Court that this warrant was not facially defective to the extent of requiring suppression of intercepted conversations relative to the criminal conduct or evidence derived therefrom. *United States v. Saliterman* (U.S.D.M.—CR 6–87–101) (1987).[15]

Because the trial court hearing the suppression motions ruled that the warrant

---

the end of thirty days regardless of whether the objective of the authorization has been achieved.

*Id.* at 496 (emphasis added). *See also United States v. Cohen*, 530 F.2d 43, 46 (5th Cir.), *cert. denied*, 429 U.S. 855, 97 S.Ct. 149, 50 L.Ed.2d 130 (1976); *People v. Scarnati*, 133 Misc.2d 795, 508 N.Y.S.2d 365 (Cty.Ct.1986); *United States v. Saliterman, et al.* CR 6–87–101 (United States District Court—District of Minnesota); *State v. Brennan*, 218 Neb. 454, 356 N.W.2d 861, 864 (1984).

**15.** Although in this setting we uphold the validity of this warrant, our holding should be neither read nor understood by prosecutors or by courts as this court's condonation of inattention or indifference to the precise statutory requirements. Although the development of modern communication technology and the employ-

ment by those engaged in criminal activity has necessitated the employment by governmental authorities of occasional eavesdropping techniques in their ongoing struggle with prosecuting criminal activity, prosecutors and courts must always afford foremost consideration to restricting that intrusion into the privacy of the citizens as much as practicable, because, almost without exception, to some degree a governmental interception of a conversation is likely to intrude upon private conversations unrelated to criminal activity. Scrupulous adherence to statutory requirements will almost certainly be more in keeping with a legislative scheme designed to protect the privacy rights of citizens. *See, e.g. United States v. Chavez*, 416 U.S. 562, 580, 94 S.Ct. 1849, 1858, 40 L.Ed.2d 380 (1974); *State v. Hinton*, 226 Neb. 787, 415 N.W.2d 138, 147 (1987).

was facially defective, it was unnecessary for it to make specific findings on the issue of whether the objective of the wiretap had been achieved at any time before the expiration of the ten-day period authorized by Minn.Stat. § 296A.06 (subd. 5). Therefore, we reverse and remand to the trial court to make specific findings on whether the objective had been attained prior to the expiration of the ten-day limit in Minn.Stat. § 626A.06, subd. 5.[16]

WAHL, Justice (dissenting).

I respectfully dissent. The trial court and the court of appeals correctly determined that the warrant authorizing the wire tap in this case was fatally defective on its face requiring suppression of the evidence obtained by the wire tap.

The language of the Privacy of Communications Act[1] is explicit and unequivocal. In addition to meeting probable cause requirements, Minn.Stat. § 626A.06, subd. 4(h) requires that wiretap warrants

[S]hall also specify * * *
a *statement* that the warrant shall be executed as soon as practicable, shall be executed in such a way as to minimize the interception of communications not otherwise subject to interception under section 626A.01 to 626A.23 *and must terminate upon attainment of the authorized objective,* or in any event in ten days.

*Id.* (emphasis added). It is undisputed that the warrant at issue did not contain the language explicitly required in subdivision 4(h). It is not for this court to determine that otherwise clear subdivisions of the act are "redundant" and need not be enforced. The legislature has provided, through

Minn.Stat. § 645.17 (1988), that the entire statute is to be presumed effective and certain.

The assistant county attorney, who drafted the warrant in issue, failed to include the termination language expressly mandated by Minn.Stat. § 626A.06, subd. 4(h). The majority determines that this violation of the termination requirement is a "technical omission" which does not require suppression of the evidence gathered. The Privacy of Communications Act provides otherwise in Minn.Stat. § 626A.04 (1988):

Whenever any wire or oral communications has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding in or before any court or grand jury if the disclosure of that information would be in violation of sections 626A.01 to 626A.23.

That disclosure of the evidence in issue would be in violation of the Act, as described in section 626A.04, is made clear in Minn.Stat. § 626A.02, subd. 1(c) (1988), which prohibits disclosure of the contents of any wiretap except as specifically authorized under the Act. Reinforcing this conclusion is Minn.Stat. § 626A.12 (1988), which permits an aggrieved party to make a motion to suppress evidence. Grounds for such a motion include facial insufficiency of the wiretap authorization. Minn.Stat. § 626A.12, subd. 1(ii). Facial insufficiency is listed separate and distinct from a motion based on a constitutional violation. Clearly the Privacy of Communications Act itself envisions motions to suppress evidence gathered pursuant to warrants which

**16.** As an aside to, but not a part of this ruling, the trial court omnibus hearing judge did opine certain hypothetical circumstances which, had they existed in fact, might have triggered the cessation. Since the application for the warrant and the warrant itself clearly particularized the subject matter of, and the persons involved in, the communications, as well as the scope of the investigation underway, we note that the arrest or charging of Mastrian or Crowley, as isolated events without more, legally would not amount to "attainment of the authorized objective" of uncovering evidence and leads to evidence to

establish the existence of this alleged widespread web of theft, burglary, shoplifting and fencing involving a number of other persons identified in the application and warrant. Additionally, on remand should the trial court find that the authorized objective had been achieved on the eighth day, intercepts of conversation prior thereto as well as evidence obtained therefrom would not be suppressible. *See, e.g., State v. Monsrud,* 337 N.W.2d 652 at 660–61.

**1.** Minn.Stat. §§ 626A.01–626A.23 (1988).

on their face fail to comply with the terms of the Act.

Out of concern for the privacy of its citizens, the legislature in Minn.Stat. § 626A.06 has created an exacting and somewhat inflexible statutory scheme which controls the issuance of wiretap warrants. This court applied that scheme literally in *State v. Frink,* 296 Minn. 57, 206 N.W.2d 664 (1973) and held a warrant invalid because the county attorney himself had not applied for the warrant as the law required. In *Frink* we explicitly rejected the "mere technical violation" argument now advanced by the State in this case. *Id.* at 72–73, 206 N.W.2d at 672–73. Subsequent to *Frink,* we decided *State v. Monsrud,* 337 N.W.2d 652 (Minn.1983). In *Monsrud* we took a "pragmatic and commonsense approach to the particularity requirement." *Id.* at 658. The majority correctly notes that this commonsense approach is justified because judgment is required to determine if the words as written in the warrant satisfy the particularity requirement of the statute. Majority op. at 765. No such judgment is required in this case. Neither the State nor the majority contend that the warrant actually complies with a literal reading of the Act. Nothing in *Monsrud* stands for the proposition that warrants, not in actual compliance with the Act, ought nevertheless to be excused for that noncompliance. Nothing in our previous case law suggests that mere technical violations of Minn.Stat. § 626A.06 should be overlooked. As the State's warrant on its face fails to comply with the Act's termination requirement, Minn.Stat. § 626A.04 requires suppression of the resulting evidence.

I would affirm the decisions of the trial court and court of appeals.

POPOVICH, Justice (dissenting).

I join in the dissent of Justice WAHL.